**Edmond and Anna GHANDOUR,**
**Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 93–658T.**

United States Court of Federal Claims.

July 8, 1996.

54

Gerald A. Holmes, Santa Rosa, California, attorney of record for plaintiffs.

Michael F. Cox, Washington, D.C., with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge:

### INTRODUCTION

The trial of this tax refund suit was held in San Francisco, California, on May 14–16, 1996. Plaintiffs, Edmond and Anna Ghandour, husband and wife, sought refunds of payments made by them towards penalties assessed against each of them, pursuant to 26 U.S.C. (I.R.C.) § 6672(a) (1994),[1] for failure

---

1. Section 6672(a) provides in pertinent part:

 Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or payment thereof, shall, in addition to other penalties provided by law,

to withhold and pay over the payroll taxes of Knots, Inc. (Knots), a toy and game manufacturing company which plaintiffs founded and in which they served as officers. Defendant, the United States, in turn, counterclaimed for the balances due from plaintiffs on the penalties that had been assessed. The following opinion memorializes the ruling from the bench given by the court immediately after closing arguments by the parties on June 6, 1996, in Washington, D.C.

For the reasons given below, the court finds that Edmond Ghandour was under a duty to collect and pay over to the Internal Revenue Service (IRS) the payroll taxes of Knots and that he willfully failed to do so with respect to the fourth quarter of 1981 and the first quarter of 1982. The court, thus, finds Edmond Ghandour liable for the penalty assessed against him pursuant to I.R.C. § 6672(a). However, the court further finds that Anna Ghandour was not under a duty to collect and pay over said taxes during the fourth quarter of 1981 and the first quarter of 1982 and that, therefore, she was not liable for the penalty provided for in I.R.C. § 6672(a).

## BACKGROUND

Edmond and Anna Ghandour founded Knots, a toy and game manufacturing company, in 1978 or 1979. From the outset and until June 1982, Edmond Ghandour was the President and Chairman of the Board of Directors of Knots. Anna Ghandour was a Director of Knots and was the corporation's first bookkeeper. Sometime before October 1981, however, she became Personnel Manager and a Vice President of the company. Furthermore, Anna Ghandour served, at various times, as both Acting Secretary and Secretary of the corporation.

At the inception of the corporation, or at least by early 1980, Edmond Ghandour owned 51% of the stock of Knots, and Anna Ghandour owned 31%. In early 1980, the breakdown of shares was as follows:

| Early 1980: | | | |
|---|---|---|---|
| | Edmond Ghandour | 260 | (51.0%) |
| | Anna Ghandour | 160 | (31.0%) |
| | Hanna Packer | 30 | ( 6.0%) |
| | Amy Ullman | 30 | ( 6.0%) |
| | Maxine Lamont | 30 | ( 6.0%) |

(Tr. 232; *see also* JX 1 (Jt.Stip.), ¶ 11). Ms. Packer was Edmond Ghandour's mother and Ms. Ullman was his sister. Thus, Mr. Ghandour's family controlled virtually all (94%) of the stock in Knots at that time.

In the summer of 1980, 150 additional shares were issued to Edmond Ghandour, increasing his share of the company to 62%, as set forth below:

| Summer 1980: | | | |
|---|---|---|---|
| | Edmond Ghandour | 410 | (62.11%) |
| | Anna Ghandour | 160 | (24.24%) |
| | Hanna Packer | 30 | ( 4.55%) |
| | Amy Ullman | 30 | ( 4.55%) |
| | Maxine Lamont | 30 | ( 4.55%) |

(Tr. 366). Again, the Ghandour family controlled nearly all of the stock of the company.

In January 1980, Mr. Ghandour had begun negotiating with Amos Krausz, a real estate developer, to obtain financing for the corporation. After an agreement was reached between the parties, however, a dispute arose and litigation resulted. On July 25, 1980, a California court issued a preliminary injunction enjoining Mr. Ghandour and Knots from selling or disposing of the stock or assets of Knots. Thereafter, on or after November 25, 1981, a settlement was entered into whereby Mr. Krausz would receive 49% of

be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

I.R.C. § 6672(a).

the stock of the company in exchange for financing. The following distribution of shares is reflected in the corporate minutes of Knots:

January 13, 1982:

| | | |
|---|---|---|
| E. Ghandour | 410 | (31.6%) |
| A. Ghandour | 160 | (12.3%) |
| H. Packer | 30 | ( 2.3%) |
| A. Ullman | 30 | (2.3%) |
| M. Lamont | 30 | (2.3%) |
| Amos Krausz | 640 | (49.2%) |

(PX 25; DX 3; DX 15; Tr. 360). However, it is unclear from the evidence if Mr. Krausz ever actually received his shares. (Tr. 430, 435; DX 15.) Assuming that Mr. Krausz did in fact own these shares, the Ghandour family, at this time, controlled approximately 48% of the stock of Knots, its lowest percentage of control at any time. At any rate, Edmond Ghandour and the other directors soon moved to dilute Mr. Krausz's holdings.

In that connection, on December 23, 1981, the Board of Directors authorized Knots to pay $100,000 to Edmond Ghandour. This money could be, and eventually was, used by him to acquire stock in the company (roughly 25,000 shares). (PX 26; Tr. 242.) Thus, by February 1, 1982, if not earlier, Mr. Ghandour again controlled a majority of the outstanding shares of Knots:

February 1, 1982:

| | | |
|---|---|---|
| E. Ghandour | 25,250 | (96.6%) |
| A. Ghandour | 160 | ( .6%) |
| H. Packer | 30 | ( .1%) |
| A. Ullman | 30 | ( .1%) |
| M. Lamont | 30 | ( .1%) |
| A. Krausz | 640 | ( 2.5%) |

(DX 53H at 395; Tr. 237, 242).

Finally, at some point in April 1982, Mr. Krausz was no longer a shareholder of Knots, resulting in the following distribution:

May 1, 1982:

| | | |
|---|---|---|
| E. Ghandour | 25,250 | (99.0%) |
| A. Ghandour | 160 | ( .7%) |
| H. Packer | 30 | ( .1%) |
| A. Ullman | 30 | ( .1%) |
| M. Lamont | 30 | ( .1%) |

(Tr. 360).

Between its founding (1978 or 1979) and October 1981, Knots was a growing company. The number of employees grew from about 10 at the beginning of 1979 to over 100 in 1981. As the company grew it departmentalized so that by 1981, there were departments for finance, sales, manufacturing, personnel, and research and development, each with its own head. Whitney Carter was hired by Edmond Ghandour in 1980 and served as Controller of the company (i.e., head of the financial department) until March 1982. After her departure, Tom Touhy, Vice President of Finance, was hired to head that department. In addition to the increase in employees, as the company grew, Knots moved to increasingly larger facilities. In mid–1981, Knots moved its operations to Hunters Point Naval Shipyard, in San Francisco, California.

In 1980, Knots set up a $5 million line of credit with Citicorp Industrial Credit (Citicorp). Under the terms of this agreement, Citicorp could lend up to 75% of the dollar amount of Knots' accounts receivable to the company, and Knots' accounts receivables

were pledged as collateral for the line of credit. Furthermore—

[u]nder the terms of the line of credit, when Knots got an order to sell [a] product, Knots would send a copy of the sales invoice to [Citicorp], and [Citicorp] would then allow Knots to borrow some fraction of the amount of the sales invoice. Later, when the customer paid for the product, Knots agreed to hand the payment over to [Citicorp] to relieve a portion of the loan.

(Jt.Stip. ¶ 23). Beginning in August 1981, Citicorp became concerned with Knots' "[t]ight cash position" and the fact that Knots' payables were "being stretched." (DX 9.) These concerns increased over the remainder of the year and, by October 31, 1981, Citicorp had requested that Knots find other financing. (DX 11; see also DX 15.) However, in November 1981, Edmond Ghandour was able to negotiate an additional loan of up to $350,000, called an "over-advance" by Citicorp. (DX 13; see also DX 14.)

Throughout the fourth quarter of 1981, Knots had failed to collect and pay over to the IRS the payroll taxes of its employees. By early January 1982, Ms. Carter, Knots' Controller, informed Citicorp that the fourth quarter of 1981 payroll taxes (roughly $120,000) were not paid. (PX 15 at 85.) In response to this revelation, Citicorp immediately ceased advancing funds to Knots, beginning in the week of January 4, until the problem could be resolved. (Id.; DX 19 at 90.) On January 15, 1982, Edmond Ghandour and Ms. Carter met with Citicorp officials to present detailed financial information on the company. Mr. Ghandour and Ms. Carter presented projections which showed "payment of the back payroll taxes in the last week of January." (DX 19 at 91.) In addition, Mr. Ghandour indicated that he would be meeting with the IRS during the following week (i.e., the week of January 18, 1982). (Id.)

On January 21, 1982, Mr. Ghandour met with Howard Schwartz of the IRS. At that time, Mr. Schwartz conducted an interview to determine whether to recommend that a penalty be assessed against Mr. Ghandour pursuant to I.R.C. § 6672(a). During this interview, according to Mr. Schwartz's report, Mr. Ghandour stated that he was aware of the

tax liability as it accrued and that other obligations were paid during the period that the tax liabilities were accruing. Moreover, Mr. Ghandour explained that the payroll taxes had not been paid due to bad Christmas sales. (DX 44.) Finally, Mr. Ghandour and the IRS agreed to a payment plan whereby Knots would remain current with all payroll tax obligations and would make monthly installments of approximately $12,000 over the course of a year towards the past due taxes. (DX 23 at 99.)

Shortly thereafter, Citicorp began requiring evidence from Knots of current payment of payroll taxes. (Id.; DX 26.) In addition, Citicorp continued to be increasingly concerned about Knots' severe cash tightness and its failure to meet cash flow projections. (DX 22; DX 26.) As a result, by January 27, 1982, Citicorp was refusing to advance the full availability on the line of credit to Knots. (DX 22.) At about this time, relations between Mr. Ghandour and Citicorp became somewhat strained. Mr. Ghandour took the position that Citicorp was required to advance Knots' full availability and that Citicorp's refusal to do so was forcing Knots to prefer some creditors over others to the detriment of the company. Citicorp, on the other hand, maintained that it had discretion as to whether to advance funds, and that the decision of what payables should be paid was solely within the discretion of Knots. (DX 30; DX 29.)

In March 1982, Knots made its first payment of $12,000 towards the delinquent fourth quarter of 1981 payroll taxes. (DX 32; DX 33.) Anna Ghandour was sent by her husband to hand deliver this check to the IRS. Despite this payment, however, Knots again failed to fully pay its federal payroll taxes for the first quarter of 1982.

On April 2, 1982, Mr. Ghandour sent a telegram to Citicorp charging that, by refusing to advance funds to Knots, Citicorp was preventing it from meeting its payroll tax obligations. (DX 34.) In response, Citicorp took the position that it had advanced sufficient funds to cover Knots' payroll taxes, but that Edmond Ghandour had "used part of the advance for purposes other than payroll taxes and withholding." (DX 35 at 126.) Shortly thereafter, Citicorp began drawing checks jointly to Knots and the IRS "to

ensure that current withholding [would be] paid when due." (DX 38 at 131–32.) On April 13, 1982, Citicorp issued a check jointly to Knots and the IRS for payroll taxes, which Knots forwarded to the IRS on April 20, 1982. (DX 58.) In addition, on April 23, 1982, Citicorp again issued a check jointly to Knots and the IRS for payroll taxes. The IRS posted this payment on May 10, 1982. (*Id.*)

Also in early April 1982, Knots was forced to shut down production due to what Mr. Ghandour claimed was Citicorp's refusal to honor the terms of the lending agreement. (PX 22.) In a letter dated April 13, 1982, Edmond Ghandour charged that Knots could not meet its payroll tax obligations due to Citicorp's refusal to advance funds. A meeting was held at Citicorp's offices on April 21, 1982, at which Mr. Ghandour and Mr. Touhy, Knots' Vice President of Finance, were in attendance. At this meeting, Mr. Ghandour and Mr. Touhy informed Citicorp that they intended to file for Chapter 11 bankruptcy around mid-June. And eventually, in June 1982, Edmond Ghandour resigned as President of Knots, and Knots filed for bankruptcy on June 17, 1982.

On April 8, 1985, the IRS assessed a penalty, pursuant to I.R.C. § 6672(a), against Edmond Ghandour, in the amount of $82,199.58, with $15,818.45 in interest assessed on December 15, 1986. Similarly, the IRS assessed a penalty in the same amount against Anna Ghandour on April 8, 1985, with interest in the amount of $15,649.44 assessed as of December 8, 1986. Payments (including credits applied from other tax returns) totalling $53,594.52 were made between January 1991 and June 1993 by Mr. Ghandour towards the assessments made against him. In addition, a single payment of $300 was made on June 8, 1993, towards the assessment against Mrs. Ghandour. On August 3, 1993, the IRS disallowed plaintiffs' administrative refund claims. Plaintiffs filed the instant tax refund suit in this court on October 26, 1993. The government has counterclaimed for the balances due on plaintiffs' assessed penalties and interest.

## DISCUSSION

### I. *Burden of Proof*

■■■ As in any tax refund case, there is a "strong presumption of the correctness of the findings" of the Commissioner. *Whiteside v. United States*, 26 Cl.Ct. 564, 566 (1992). The plaintiffs bear the burden of rebutting this presumption with "substantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States*, 510 F.2d 1365, 1369 (Ct.Cl. 1975). Of course, plaintiffs bear this burden as to each and every element of their claim. Furthermore, on the government's counterclaim for balances due, because defendant can make out a *prima facie* case by simply introducing the assessment into evidence, plaintiffs again bear the burden, once said prima facie case has been made, of going forward with the evidence and the ultimate burden of persuasion of proving that they were not responsible persons or that they did not willfully fail to pay the taxes. *Pototzky v. United States*, 8 Cl.Ct. 308, 315 (1985). In essence then, plaintiffs bear the burden of proof with respect to both their claim and the government's counterclaim. *Bolding v. United States*, 565 F.2d 663, 672 (Ct.Cl.1977).

### II. *Statutory Provisions and Case Law*

■■■ Under the tax laws of this country (*i.e.*, the Internal Revenue Code), employers are required to collect (through withholding) certain taxes from their employees, the taxpayers. *See, e.g.*, I.R.C. §§ 3102(a) (FICA withholding), 3402(a) (federal income tax withholding) (1994). "The withheld sums are commonly referred to as 'trust fund taxes,' reflecting the Code's provision that such withholdings or collections are deemed to be a 'special fund in trust for the United States.' 26 U.S.C. § 7501(a)." *Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978). The employer is required to pay over these "trust fund taxes" to the government and is liable for the amount of taxes which should have been paid. *E.g.*, I.R.C. §§ 3102(b), 3403 (1994). In addition, the Code allows the government to recover any amounts not paid by the employer by assessing a penalty against those persons within the employer corporation who were responsible for the failure to pay the trust fund taxes to the government. *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed.Cir. 1984) (citing *White v. United States*, 372 F.2d

513, 516 (Ct.Cl.1967)), *rev'g* 3 Cl.Ct. 595 (1983).

I.R.C. § 6672(a) provides, in pertinent part, that:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

Furthermore, I.R.C. § 6671(b) states as follows:

The term "person," as used in this subchapter [including § 6672(a) above], includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

From these two statutory provisions, it is clear that, in order to be found liable for the penalty, an individual must have: (1) been "under a duty" to collect, truthfully account for, and pay over trust fund taxes; *and* (2) willfully failed to do so or willfully attempted to evade or defeat payment of the tax.

A. *Responsible Person*

■ Before the penalty may be assessed against an individual, he must be found to have been a "responsible person" within the employer organization. A "responsible person" is one who was under a duty to collect, truthfully account for, and pay over the taxes at issue. In order to make this determination, the fact-finder must look for those individuals who had "the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations." *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir.1975), *quoted in Godfrey*, 748 F.2d at 1575. Stated slightly differently, a responsible person is one "with ultimate authority over expenditure of funds." *Godfrey*, 748 F.2d at 1575 (quoting *White*,

372 F.2d at 517). This is necessarily a fact-intensive inquiry, and the courts have generally focused on those facts bearing on an individual's "status, duty, and authority" within the employer corporation. *Greenberg v. United States*, 46 F.3d 239, 243 (3rd Cir. 1994); *Gephart v. United States*, 818 F.2d 469, 475 (6th Cir.1987); *Mazo v. United States*, 591 F.2d 1151, 1156 (5th Cir.1979); *Sale v. United States*, 31 Fed.Cl. 726, 731 (1994) (describing these concepts as "interrelated"); *Hammon v. United States*, 21 Cl.Ct. 14, 24 (1990). "[A]ny person with sufficient status, duty and authority to avoid the default is a responsible person under § 6672." *Sale*, 31 Fed.Cl. at 731 (quoting *Heimark v. United States*, 18 Cl.Ct. 15, 21 (1989)). *Cf. White*, 178 Ct.Cl. at 778 ("the authority, powers, and duties exercised by plaintiff" made him a responsible person).

1. *Status*

■ An individual's status is to be determined by reference to such things as his title or position within the corporate structure (*e.g.*, an officer or director), as well as his ownership stake in the employer corporation. *Sale*, 31 Fed.Cl. at 731 ("As president, treasurer, chairman of the board, and majority shareholder, plaintiff's status at [the corporation] was undeniable."); *Hammon*, 21 Cl.Ct. at 24–25 (plaintiff who was president, majority stockholder, and director of two employer corporations had sufficient status to be found responsible as to each under I.R.C. § 6672). However, the holding of corporate office alone is not sufficient to trigger liability under I.R.C. § 6672(a). In this connection, the Federal Circuit held in *Godfrey*:

The Claims Court effectively held that Godfrey's *status* as chairman cum advisor-negotiator—and the respect and deference accorded that status—amounted to "ultimate authority" or "power to control" for purposes of § 6672. The case law will not support that holding.

It is material, but not controlling. . . .

748 F.2d at 1575. Conversely, the absence of any official corporate title will not suffice to remove liability. *See Whiteside*, 26 Cl.Ct. at 568–73 (plaintiff who held no official corporate title, but was listed on bank signatory

cards as "Vice President" and exercised significant financial oversight and management, was a responsible person). Accordingly, a party's status is but one factor bearing on the ultimate issue, *i.e.*, whether the individual had the "power to control" the finances of the employer such that he could have avoided the default.

### 2. *Duty*

Next, the finder of fact must examine a person's duties within the employer organization to determine whether he was a responsible person under I.R.C. § 6672. "[A] person's 'duty' under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds." *Godfrey,* 748 F.2d at 1576. In this connection, a person's duties are to be evaluated in terms of those affairs of the corporation over which that individual had responsibility, *i.e.,* the job description. For instance, duty may be determined by reference to corporate by-laws and resolutions, *Hammon,* 21 Cl.Ct. at 25, or to the duties actually performed by an individual in the course of business. *See, e.g., Sale,* 31 Fed.Cl. at 731; *Whiteside,* 26 Cl.Ct. at 571–72. Ultimately, the crucial inquiry is whether a person had a duty to oversee, manage, or administer the financial affairs of the company, specifically with reference to the paying of creditors and taxes.

### 3. *Authority*

Finally, a person's authority within the corporation is highly relevant in ascertaining whether an individual was a responsible person for the purposes of I.R.C. § 6672. In this connection, the Federal Circuit noted that—

> where a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of the payroll, or controls the voting stock of the corporation, he will generally be held "responsible."

*Godfrey,* 748 F.2d at 1576. The focus here is on "actual authority," *i.e.,* substance as opposed to form. *Hammon,* 21 Cl.Ct. at 26. *See also Whiteside,* 26 Cl.Ct. at 573. Among the indicia of authority which have been found by the courts to be noteworthy are the powers to—vote significant blocks of stock, sign checks, hire and fire employees, control employees' pay, enter contracts on behalf of the corporation, make decisions regarding the finances of the corporation, and prepare corporate tax strategies. *See White,* 372 F.2d at 520; *Sale,* 31 Fed.Cl. at 731–32; *Whiteside,* 26 Cl.Ct. at 573; *Sulger v. United States,* 24 Cl.Ct. 535, 538 (1991); *Hammon,* 21 Cl.Ct. at 26. Again, the ultimate question is—whether, in combination with his status and duty, an individual had sufficient authority within the employer company to prevent the default on the corporation's withholding tax obligations.

### 4. *Delegation*

Frequently, a party will attempt to negate the inference that he was a "responsible person" under § 6672(a) by demonstrating that the responsibilities and duties over the collecting, truthfully accounting for, and paying over of the taxes was delegated to another individual. The courts, however, have resisted this line of argument. *See United States v. McCombs,* 30 F.3d 310, 320 (2nd Cir.1994); *Sulger,* 24 Cl.Ct. at 538–39. This rejection is due to a recognition that, even where an individual delegates significant responsibilities to others, he still retains final authority and oversight responsibility over his subordinates. In *Sulger,* the Claims Court explained that:

> The evidence at trial simply does not support a conclusion that plaintiff ever divested himself of the power and ultimate authority to determine what bills should be paid and when. Plaintiff and the board of directors never handed absolute financial authority over to [a subordinate].
>
> \* \* \* \* \* \*
>
> There simply was never the type of complete delegation of authority that could support a conclusion that plaintiff no longer had the requisite authority to be a "responsible person."

24 Cl.Ct. at 538–39. Accordingly, it is not sufficient that a party point to *another* "responsible person," as more than one individual may be found to have been a "responsible person" within an employer company. *Gep-*

*hart*, 818 F.2d at 473; *Godfrey*, 748 F.2d at 1574–75; *Scott v. United States*, 354 F.2d 292, 296 (Ct.Cl.1965); *Hammon*, 21 Cl.Ct. at 24. Rather, in order to avoid liability, an individual must show that he was completely divested of the power to see to it that the taxes were paid.

### B. *Willfulness*

 Second, after it has been determined that an individual was a "responsible person," the court must next ascertain whether that person acted "willfully" in failing to collect, truthfully account for, and pay over the withheld payroll taxes. I.R.C. § 6672(a). The Supreme Court has construed § 6672 as requiring an element of "personal fault" before an individual can be held liable for the penalty. *Slodov*, 436 U.S. at 254, 98 S.Ct. at 1788. As the Court of Claims explained, however—

> it is not necessary that there be present an intent to defraud or to deprive the United States of taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness.

*White*, 372 F.2d at 521. On the other hand, "mere negligence" is insufficient to constitute willfulness under I.R.C. § 6672. *Godfrey*, 748 F.2d at 1577. Rather, the requisite "personal fault" may be shown in one of two ways: (1) "a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the Government," *White*, 372 F.2d at 521, *quoted in Godfrey*, 748 F.2d at 1577, or (2) "reckless disregard of a known or obvious risk that [the taxes] may not be remitted to the Government." *Godfrey*, 748 F.2d at 1578 (quoting *Mazo*, 591 F.2d at 1154).

### 1. *The "Deliberate Choice" Standard*

 First, an individual has acted willfully if he made a deliberate and intentional choice to prefer other creditors over the government. Because the required preference of other creditors over the government must have been deliberate, *i.e.*, voluntary and intentional, it follows that the deliberate choice standard of willfulness can only be met if the responsible individual had *actual knowledge* of the specific tax delinquency for which the penalty was assessed.

It is not sufficient that a responsible person knew of an earlier delinquency that was paid in full. *See Godfrey*, 748 F.2d at 1577. Moreover, if the choice by a corporate official to pay others instead of the taxes is to be found to have been deliberate, it follows that there must have been unencumbered funds available to pay the taxes at the time the taxes came due. If, on the other hand, when a responsible person learns of the taxes due, there are no funds available to pay over said owing taxes to the IRS, he need not "order the impossible," and the failure to pay the taxes will not be deemed willful under the deliberate choice standard. *Id.*

 In assessing willfulness under I.R.C. § 6672, the focus is on "the taxpayer's diligence in attending to the duty to pay employment taxes." *Hammon*, 21 Cl.Ct. at 27. In this connection, the use of "*available* corporate money for other business purposes," *Powell v. United States*, 9 Cl.Ct. 58, 62 (1985) (emphasis added), when a responsible person has knowledge of a current tax liability, will constitute a "willful" failure to collect, account for, and pay over the due employment taxes, under the deliberate choice standard.

### 2. *The "Reckless Disregard" Standard*

 Second, where a responsible person recklessly disregards a known or obvious risk that the taxes will not be paid to the IRS, and the taxes are in fact not paid, he has been "willful" as that term is used in I.R.C. § 6672, and may be assessed a penalty under that section. In *Hammon*, 21 Cl.Ct. at 29–30, the Claims Court laid out the test for recklessness under § 6672, delineating the following three elements:

> (1) the responsible person's knowledge (or reason to know) of a risk that taxes will not be paid, (2) a reasonable opportunity to discover and remedy the problem, and (3) a failure to undertake the reasonable efforts to ensure payment.

*See also Whiteside*, 26 Cl.Ct. at 573–74. The Seventh Circuit, in *Wright v. United States*, 809 F.2d 425, 427 (7th Cir.1987), expounded a very similar test, holding that—

> the "responsible person" is liable if he (1) clearly ought to have known that (2) there

was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily.

Under either formulation, it is clear that the responsible individual must have had at least constructive knowledge of a *risk* that the employment taxes would not be paid, and must have had an opportunity to act on that knowledge to discover any problems in payment.

In *Hammon,* for example, the court found that "plaintiff improperly relied on the same management which *historically* caused repeated tax difficulties" and failed, thereafter, to "institute safeguards to ensure that similar delinquencies would not recur." 21 Cl.Ct. at 28 (emphasis added). Based on these facts, in combination with plaintiff's failure to "make simple inquiries to ensure payment of taxes," the Claims Court found that plaintiff had recklessly disregarded his tax payment duties. *Id.*

■ Therefore, if the facts and circumstances of a particular case, taken as a whole, demonstrate that a responsible individual knew or should have known that there was a risk that the taxes would not be paid, and failed to take available corrective action, with the result being that the government is not paid taxes to which it is entitled, that individual will be found to have willfully failed to pay over withholding taxes under I.R.C. § 6672(a). In sum, a responsible person is liable under § 6672(a) if he either deliberately chose to pay other creditors over the government or if he recklessly disregarded a known or obvious risk that the withholding taxes would not be paid to the government as required.

III. *Analysis*

From the foregoing discussion, then, it is clear that each plaintiff bears the burden of proving, by a preponderance of the evidence, that: (1) he or she was not a responsible person; or (2) he or she did not willfully fail to collect and pay over the payroll taxes of the corporation. Accordingly, we address each of these issues within the context of the preceding law, taking each plaintiff *seriatim* and making the following additional num-

bered findings of fact, and drawing the conclusions set forth below.

A. *Edmond Ghandour*

*Responsible Person*

■ First, the court finds that Mr. Ghandour was a responsible person under § 6672(a) with respect to the 4th quarter of 1981 and the 1st quarter of 1982 payroll taxes of Knots, based on the following findings of fact. Moreover, plaintiffs' counsel conceded in closing argument that Mr. Ghandour was in fact a responsible person.

*Status*

1. Mr. Ghandour was the co-founder of Knots in 1978 or 1979.

2. He was President and Chairman of the Board throughout the life of the corporation until June 1982.

3. He owned (or controlled with his family) 48% or more of the stock at all times during the life of the corporation, and was the majority shareholder for most, if not all, of the time.

*Duty*

4. Mr. Ghandour had substantial duties at Knots, including all of the powers and duties normally associated with his position(s).

5. He had the overall financial responsibilities and duties at Knots, including, but not limited to, the following:

a. in-depth involvement in the financial affairs of Knots;

b. reviewing periodic financial reports of the company;

c. making "strategic decisions" about the finances of the company (Jt.Stip. ¶ 17);

d. negotiating terms of credit with lenders;

e. dealing with Citicorp Industrial Credit (Citicorp);

f. signing payroll tax returns; and

g. negotiating with Amos Krausz for financial backing.

6. He had the power and the responsibility to determine and decide which creditors would get paid and in what order. Whitney

Carter, the Controller of Knots, testified that "he made all the decisions on who got paid," and that "Mr. Ghandour would make the decisions who the checks would be issued to" based on her reports of the payables due. (Tr. 29.)

7. Mr. Ghandour kept substantial financial responsibilities to himself rather than delegating, due to an involved and hands-on management style and personality. Ms. Carter testified that his management style was "Hands-on, definitely. He controlled everything." (Tr. 29.) In addition, a 1981 Citicorp memorandum to the Knots credit file indicated that Mr. "Ghandour's major shortfall is his inability to delegate. He makes all decisions, and while away, the administrative end of the business slows down considerably"; and further that he "runs the show and makes all decisions." (DX 8 at 52, 57.) This was further confirmed by the court's observation of his bearing and demeanor at trial.

### Authority

8. Mr. Ghandour had check signing authority over the bank accounts of Knots at all relevant times. He could sign checks alone, without an additional signature.

9. Mr. Ghandour and his immediate family controlled significant blocks of voting stock.

10. He had authority to hire and fire employees; e.g., he hired and fired (or claims to have) Whitney Carter.

11. He had authority to enter into contracts on behalf of the corporation, e.g., the line of credit agreement with Citicorp; he also negotiated with suppliers and major customers and was authorized to purchase a health insurance plan for the employees.

12. He had authority to make financial decisions for the corporation. For instance, Mr. Ghandour dealt with Citicorp, either alone or with Ms. Carter, and he alone negotiated the payment plan with the IRS.

Based on all of the foregoing, the court finds that Edmond Ghandour had overwhelming status, duty, and authority within Knots to avoid the default on the tax obligations. Mr. Ghandour had "ultimate authority over expenditure of funds" at Knots, *Godfrey*, 748 F.2d at 1575. Therefore, we find that the evidence is overwhelming that Mr. Ghandour was a responsible person, under § 6672, at all relevant periods herein.

### Willfulness

Next, the court finds that Mr. Ghandour willfully failed to pay the payroll taxes because he made a deliberate choice to pay other creditors and expenses in preference to the United States Government, as is shown in the following findings:

### Knowledge

13. Ms. Carter, the Controller, told Mr. Ghandour about the 4th quarter of 1981 payroll tax liabilities as they accrued and urged him to go to the IRS in early 1982.

14. Mr. Ghandour told an IRS interviewer, Howard Schwartz, that he was aware of the 4th quarter of 1981 tax liabilities as they accrued, i.e., with each pay period.

15. Ms. Carter told Citicorp of the past due taxes on or before January 8, 1982. It is reasonable to infer that Ms. Carter told Mr. Ghandour before she told Citicorp, as per Finding No. 13 above, especially given his heavy involvement in the financial affairs of the company and his hands-on management style. Her confirming testimony was as follows (Tr. 86):

Q. But you would have told Mr. Ghandour [of the past due taxes] before you told Citicorp[?]

A. I would have—oh, yes, of course.

16. On January 15, 1982, Mr. Ghandour and Ms. Carter met with Citicorp and presented projections demonstrating that Knots could pay its past due taxes by the end of January, as is shown in the Citicorp memorandum memorializing that meeting. Thus, he must have known of the 4th quarter of 1981 accrued tax liability prior to January 15, 1982.

17. He met with Mr. Schwartz of the IRS on January 21, 1982.

18. Given all of the evidence, the court totally discounts Mr. Ghandour's self-serving testimony that he did not learn of the payroll

tax delinquency until the end of January 1982. The court's opportunity to observe the witness's demeanor and listen to his testimony has convinced it that Mr. Ghandour was a non-credible witness. Rather, the court finds that he gave evasive answers and, at a minimum, tended to shade the unadulterated truth. The overwhelming weight of the evidence, therefore, suggests that Mr. Ghandour was fully aware of the accruing payroll tax delinquencies as they accrued in the last quarter of 1981.

19. The court likewise totally discounts Mr. Ghandour's testimony that he did not become aware of the 1st quarter of 1982 payroll tax delinquencies until the end of March 1982. Given all that had occurred with the last quarter of 1981 taxes, the company's dire financial straits, his intense involvement in the financial affairs of Knots, his frequent discussions with Ms. Carter, and his ongoing efforts to pay the past due taxes and keep current with new tax liabilities, it is substantially more likely than not that Mr. Ghandour also knew of the 1st quarter of 1982 tax liabilities as they accrued.

### Preference of Other Creditors

20. Anna Ghandour received a salary from Knots during October 1981 through March 1982 (except for December 1981), and Mr. Ghandour received a salary as well during that time.

21. During the relevant period, Mr. Ghandour received reimbursement checks from Knots for travelling expenses, etc.

22. From January 1982 to June 1982, Knots paid its suppliers and vendors between $50,000 to $200,000 in payables.

23. In late March or early April 1982, Mr. Ghandour used money advanced by Citicorp for purposes other than paying current payroll taxes. In a letter to Mr. Ghandour prepared by Citicorp's attorney, Citicorp stated that: "We understand that you used part of the advance for purposes other than payroll taxes and withholding." (DX 35).

24. Thereafter, Citicorp began issuing loan checks jointly to Knots and the IRS, so that Mr. Ghandour would not be able to use the money for other purposes and to ensure that taxes were paid. In Citicorp's April 14, 1982 quarterly review of Knots, Citicorp's Vice President, Herb Fischer, stated—"We are now drawing checks jointly to Knots and the IRS to ensure that current withholding is paid when due." (DX 38 at 131–32.) This corrective action taken by Citicorp supports the credence given by the court to the statement contained in the letter prepared by Citicorp's attorney, indicating that Mr. Ghandour used funds that had been advanced for purposes other than payroll taxes.

25. On January 21, 1982, Mr. Ghandour told the IRS that he had authorized, and we find that he did in fact authorize, payment of other business expenses by Knots while tax liabilities accrued.

26. On December 23, 1981, the board of directors authorized Knots to pay $100,000 to Edmond Ghandour. The money could be, and was eventually, used by him to purchase stock in the company.

Accordingly, we conclude that Mr. Ghandour knowingly and voluntarily paid other creditors and expenses of the company while Knots' payroll tax liabilities were accruing in both the last quarter of 1981 and the 1st quarter of 1982, and thereafter. Thus, he willfully failed to pay payroll taxes that were due. On this record, we find the requisite willfulness on the part of Mr. Ghandour as contemplated by I.R.C. § 6672(a).

### B. Anna Ghandour
#### Responsible Person

Second, the court finds that Anna Ghandour was *not* a responsible person within the purview of § 6672(a), because her *actual authority and responsibilities* were insufficient to give her a duty to account for and pay over the past due taxes. In this connection the court observes and finds that:

#### Status

27. Mrs. Ghandour was a co-founder, Vice President, and Director of Knots, and was the Personnel Manager during the period in question. In addition, she served as Acting Secretary and, later, Secretary of the corporation.

28. She held 31% of the shares of Knots until the summer of 1980, after which time her percentage of ownership decreased as more shares were issued.

### Duty

29. During October 1981 through June 1982, Mrs. Ghandour's duties as Personnel Manager were to process new employees and their health insurance forms and to listen to employee grievances. In addition, she only worked approximately 30 hours per week during this time period.

30. As Secretary, her duties were to record and sign the minutes of board meetings and shareholder meetings.

31. Her financial responsibilities at Knots were minimal:

a. She was not involved with the payroll or with paying the taxes of the corporation;

b. She did not deal with Citicorp; Mr. Ghandour and Ms. Carter did that;

c. Ms. Carter, the Controller, reported directly to Mr. Ghandour, not to Mrs. Ghandour, even when he was away from the office;

d. Ms. Carter apprised Mr. Ghandour, not Mrs. Ghandour, of the financial situation of the company through financial reports and discussions; and

e. Mrs. Ghandour only signed corporate checks when Mr. Ghandour was unavailable, and only with his direction and approval.

32. Mr. Ghandour, not Mrs. Ghandour, made all decisions concerning who would be paid by Knots.

### Authority

33. Mrs. Ghandour had check-signing authority at Knots. However, the Bank of America signature card introduced into evidence, which account was opened in 1978, contains chronological date stamps ending in mid–1980, tending to indicate that that account was closed around that time. The Interstate Bank account was not opened until May 1982, when the Crocker Bank account was closed. Thus, only the Crocker Bank account, opened in July 1980, appears to have been in use during October 1981 through March 1982. On this account, Mr. Ghandour could sign alone, or two out of the three of Mr. Ghandour, Mrs. Ghandour, and Ms. Carter could issue a check. Thus, Mrs. Ghandour could not issue a check on this account alone. Nor could she, by her refusal to sign, prevent the issuance of a check, as Mr. Ghandour alone, or Ms. Carter with Mr. Ghandour's co-signature, could issue checks.

34. Mrs. Ghandour's voting power was greatly diminished by the issuance of additional shares in 1981 through 1982.

35. Mrs. Ghandour's actual authority (especially over financial matters) was minimized by the fact that her husband essentially dominated the corporation. The record fails to show whether she had the authority to hire or fire employees or to enter into contracts on behalf of the corporation. However, given the totality of the evidence, it is more likely than not that she did not have such authority absent express approval from Mr. Ghandour.

36. Mrs. Ghandour played a minor role, at most, in the major financial decisions of the corporation, from October 1981 through June 1982:

a. She took a check to the IRS at Mr. Ghandour's request in a sealed envelope, the contents of which she never saw;

b. Mr. Ghandour alone negotiated with the IRS to establish a payment plan; and

c. Mrs. Ghandour took no part in the on-going negotiations and discussion with Citicorp concerning the line of credit and the overall financial picture of Knots.

While Mrs. Ghandour had significant status at Knots, her "actual authority" and responsibilities at the company were minimized and were centered on non-financial matters. Given the totality of the circumstances, the court finds that Mrs. Ghandour's duty and authority were marginalized by Mr. Ghandour's virtual dominance of the financial affairs of the company to such a great extent that she did not have sufficient status, duty, and authority to have been able to have prevented the default. She did not have "the power to control the decision-making process by which the employer corporation allocates funds to

other creditors in preference to its withholding tax obligations," *Godfrey,* 748 F.2d at 1575; nor was she "a person with ultimate authority over expenditure of funds" at Knots, *id.;* nor was Mrs. Ghandour *"in fact responsible for controlling corporate disbursements." Id.* In reaching this conclusion, the court is persuaded by the documentary evidence in the record, the testimony of Whitney Carter concerning the financial operations of Knots, the bearing and demeanor of Mr. Ghandour, as well as the testimony and demeanor of Mrs. Ghandour. Because Mrs. Ghandour was not a responsible person, we need not address the issue of willfulness.

## CONCLUSION

Based on all of the foregoing, we hold that—

(i) Plaintiffs have failed to prove by a preponderance of the evidence that Mr. Ghandour was not a responsible person under I.R.C. § 6672.

(ii) Plaintiffs have failed to prove by a preponderance of the evidence that Mr. Ghandour was not willful in his failure to pay the payroll taxes of Knots. Thus, plaintiffs have failed to rebut the presumed correctness of the Commissioner's determination with respect to Edmond Ghandour.

(iii) Plaintiffs have successfully met their burden of demonstrating that it is more likely than not that Mrs. Ghandour was not a responsible person under I.R.C. § 6672 during October 1981 through June 1982. In other words, we find that substantial evidence supports the conclusion that the Commissioner's determination that Anna Ghandour was a responsible person was in error.

Plaintiffs are, therefore, entitled to judgment with respect to Anna Ghandour for both the 4th quarter of 1981 and the 1st quarter of 1982. But, defendant is entitled to judgment for the balance of the penalty due from Edmond Ghandour for both the 4th quarter of 1981 and the 1st quarter of 1982. The parties shall confer and file, on or before August 15, 1996, a joint stipulation as to the amount of the foregoing judgments.

IT IS SO ORDERED.