David F. COOK, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–525T.

United States Court of Federal Claims.

March 21, 2002.

---

William A. Roberts, Dallas, Texas, counsel for plaintiff.

Charles J. Crueger and Charles M. Ruchelman, U.S. Department of Justice, with whom were Assistant Attorney General Eileen J. O'Connor, Mildred L. Seidman, and David Gustafson, counsel for defendant.

OPINION

ALLEGRA, Judge.

This case is before the court following a trial held in Dallas, Texas. At issue is whether plaintiff is liable for a so-called "responsible officer" penalty imposed upon him

under section 6672 of the Internal Revenue Code of 1986 (26 U.S.C.). Plaintiff paid $100 of this penalty and seeks a refund; defendant has counterclaimed for the balance of the assessment, $97,976.00, plus interest. For the reasons that follow, this court concludes that plaintiff is liable for this penalty.

## I. STATEMENT OF FACTS

On June 28, 1982, David F. Cook (plaintiff) and three other investors formed National Metal Finishing, Inc. (NMFI), a Texas corporation specializing in the manufacture of aircraft wings. NMFI's manufacturing operations occurred at two sites. The company formed aircraft wings at a plant in Weatherford, Texas and tested and treated wings for fatigue and resistance at a plant in Dallas, Texas. For most of NMFI's lifespan, its administrative offices were located in downtown Dallas, independent of its manufacturing sites.

Throughout NMFI's existence, Mr. Cook served as its controlling shareholder and president, as well as a member of its board of directors. Mr. Cook contributed the original start-up capital to found NMFI and owned 37 percent of the company from the time of its inception through 1987. In 1987, Edward Rose bought out three of the original shareholders, taking a 45 percent ownership share in the corporation and leaving Mr. Cook with a controlling portion of 55 percent of the stock.[1] Mr. Rose did not serve as an officer of NMFI, nor was he involved in its day-to-day operations.

An experienced aerospace engineer, Mr. Cook was determined to make NMFI a success. He oversaw most of NMFI's operations, dividing his efforts between the company's manufacturing sites and administrative offices. In his capacity as president, Mr. Cook signed leases, promissory notes and workers' compensation agreements on behalf of NMFI. He also had signature authority over NMFI's checking account[2] and determined the payment schedule for the company's creditors. He was responsible for the corporation's hiring and firing decisions, as well as the regulation and implementation of its payroll. Mr. Cook signed NMFI's tax returns and monitored the company's finances through monthly reports prepared by the firm's bookkeeper. Despite his efforts, NMFI struggled financially. On three different occasions prior to 1989, Mr. Cook contributed personal funds to cover NMFI's operating expenses, including one 1988 period during which he paid the firm's entire payroll.

The beginning of the end for NMFI occurred in 1988 when the City of Dallas and the State of Texas raised environmental concerns regarding the company's procedures for disposing of chemicals used at its Dallas site. NMFI's access to city sewer lines was temporarily disconnected on multiple occasions, the first time in 1988. The cost of remedying these environmental problems was estimated to be between $200,000 and $300,000. This additional expense threatened to overwhelm the company's already strapped resources.

In March of 1989, Mr. Cook consulted bankruptcy counsel on behalf of NMFI. On April 26, 1989, Mr. Cook pleaded no contest to misdemeanor charges of violating state environmental laws. He was placed on probation for six months, with the understanding that further violations by NMFI would result in his being personally liable for a fine of $1,000, plus court costs. On May 11, 1989, NMFI, though still solvent, filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.

On June 13, 1989, the bankruptcy court issued an Order Granting Adequate Protection of a secured creditor, which allowed NMFI to function as a debtor in possession, while setting parameters on how the business would be run. Under this order, NMFI was prohibited from operating its Dallas facility and from utilizing more than $25,500 of its

---

1. The record does not disclose how plaintiff began with 37 percent of the stock and, after this transaction, ended up with 55 percent.

2. NMFI's bookkeeper and Mr. Cook's then-wife were also authorized to sign checks on the company's behalf, but the evidence indicates that these duties were purely ministerial and that no one but Mr. Cook decided whom to pay or what checks to write.

receivables per month. In response to a motion by NMFI and on the strength of testimony by Mr. Cook, the bankruptcy court modified its adequate protection order on June 27, 1989. The modified order allowed NMFI to "recommence" its business operations at its Dallas facility (in fact, NMFI had never actually ceased operations at that facility). It also altered the restrictions on NMFI's use of its funds, requiring NMFI to place all collections of its accounts receivable made subsequent to June 2, 1989, in a Debtor In Possession (DIP) account. Bridge Bank, the superior secured creditor of NMFI, was allowed to withdraw 25 percent of the funds from the DIP account to reduce NMFI's outstanding debt. NMFI was authorized to use the remaining 75 percent of its collected receivables to continue its ordinary business operations. Through subsequent orders, beginning with one issued November 28, 1989, Bridge Bank's access to NMFI's DIP account eventually was reduced to between 5 percent and 17.5 percent of the account.

On August 10, 1990, an Order Confirming NMFI's Amended Plan of Reorganization and Modification was filed. Pursuant to the confirmed reorganization plan, NMFI ceased operation in December 1990 upon the sale of its assets. The $700,000 generated by the sale of assets was used exclusively to repay fully NMFI's debt with Bridge Bank.

Immediately prior to filing its petition for bankruptcy and throughout most of the time that its reorganization was pending, NMFI failed to pay federal employment taxes due on the wages its employees received. Specifically, NMFI failed to make any payments for the first and fourth quarters of 1989 and all four quarters of 1990 in the following amounts:

| QUARTER | PAYROLL TAX |
| --- | --- |
| 1st Quarter, 1989 | $30,952.94 |
| 4th Quarter, 1989 | $21,433.09 |
| 1st Quarter, 1990 | $26,133.53 |
| 2nd Quarter, 1990 | $27,957.01 |
| 3rd Quarter, 1990 | $21,591.40 |
| 4th Quarter, 1990 | $ 8,182.20 |

Additionally, NMFI incurred interest and penalties of $1,164 for late payment of its payroll taxes for the third quarter of 1989.[3]

Despite not paying over the payroll taxes it owed, NMFI eventually filed the requisite returns for each of the quarters in question. The company had a standard procedure for preparing the returns, which were due one month after the end of each quarter. Judy Combs, NMFI's bookkeeper, would accumulate the relevant data through a specialized computer program and then use it to complete a copy of Internal Revenue Service (IRS) Form 941 "Employer's Quarterly Federal Tax Return." Ms. Combs dated the forms as she prepared them and gave them to Mr. Cook to sign as president of the company. After signing the forms, Mr. Cook would return them to Ms. Combs for transmittal to the IRS. Mr. Cook signed the Forms 941 for all of the periods at issue; indeed, no one other than Mr. Cook ever signed Forms 941 on behalf of NMFI.

However, there are indications that the corporation deviated from its standard business routine in preparing the returns for the quarters at issue here. With the exception of the return for the first quarter of 1989, all of the relevant returns were filed late. NMFI's return for the fourth quarter of 1989, due January 31, 1990, was prepared January 30, 1990, but not filed with the IRS until June 11, 1990. Its return for the first two quarters of 1990, due April 30 and July 31 respectively, were received by the IRS on November 30, 1990. Likewise, the IRS received NMFI's return for the third quarter of 1990, due October 31, on December 20, 1990. NMFI's return for the fourth quarter of 1990, due January 31, 1991, was received by the IRS on February 13, 1991. Additionally, the dates on the returns for the first two quarters of 1990 appear to have been altered prior to filing. On all six returns, the lines indicating the amount deposited for the quarter were left blank. At trial, Ms. Combs testified that she had prepared these returns

---

3. NMFI paid its third quarter payroll taxes on November 27, 1989, approximately one month overdue. Although NMFI paid its original obligation for that quarter in full, it never paid the interest and penalties assessed for the late payment.

in accordance with her prior practice and thus in advance of their due dates. However, neither she nor Mr. Cook could remember discussing the returns prior to filing them and thus no explanation was given as to why the returns were filed late or when Mr. Cook actually signed them.

The bankruptcy court never directly addressed the issue of NMFI's overdue employment taxes and, despite Mr. Cook's assertions to the contrary, it appears that the court was never fully apprised of NMFI's payroll tax difficulties. NMFI's statement of pre-petition liabilities, signed by Mr. Cook on May 26, 1989, included $37,748.04 in taxes owed to the federal government, of which $30,952.94 could be accounted for as overdue withholding taxes and related penalties. However, despite having taken no steps to reduce or eliminate its debt to the IRS, the comparative balance sheets NMFI periodically submitted to the bankruptcy court omitted all reference to payroll tax liabilities; notably, the entire "Taxes Payable" section of these forms, including a line for "Federal Payroll Taxes," was consistently left blank. Moreover, although broad references to tax obligations were made at different points during the bankruptcy proceedings, none of the court's intermediate orders ever discussed this matter. Mr. Cook admitted that the bankruptcy judge never explicitly prohibited him from paying NMFI's steadily accruing employment taxes and that he never sought the judge's guidance on the matter. In contrast, the bankruptcy judge did specifically forbid NMFI from paying rent on its Dallas facility[4] and from paying Mr. Cook's salary for a four month span; the judge also expressly authorized the continued payment of Ms. Combs's salary during the reorganization. The confirmed reorganization plan incorporated payment of outstanding income taxes, but was silent regarding the company's overdue employment taxes.

Throughout the time NMFI's employment tax bill was accumulating, Mr. Cook signed checks to pay the company's trade creditors, utilities, environmental cleanup costs and rent on its Weatherford plant. He also signed NMFI's payroll checks and authorized his wife to receive a 1990 salary of $19,500, even though she provided no direct services to the company. Mr. Cook testified that, for most of 1989 and 1990, NMFI had insufficient funds to allocate the appropriate amounts to a government trust fund account for payment of its employment taxes. He indicated that NMFI had not diverted withheld tax money to other uses; it had never had the money to withhold in the first place, effectively paying its employees "net wages."

According to Mr. Cook, his understanding of the judge's top priority during and after the reorganization period was operation of the company to enable cleanup of the environmental difficulties at the Dallas plant. To this end, between 1989 and 1990, he contributed approximately $80,131.51 of his own money to meet NMFI's environmental cleanup expenses. Mr. Cook also paid some of the Dallas cleanup costs with funds generated by National Shot Peening, Inc., the small aerospace company that he founded after the demise of NMFI. In addition to paying NMFI's environmental expenses, between May 1989 and May 1990, Mr. Cook used approximately $10,000 of his private funds to pay some of NMFI's business related costs such as lawyer's fees and travel expenses.

On June 8, 1992, the IRS assessed against Mr. Cook a penalty of $97,760.00 pursuant to section 6672(a) of the Code, for failure to pay over withheld employment taxes. On September 8, 1997, plaintiff paid $100.00 of the penalty and filed a claim for refund. When this claim was neither accepted nor rejected, plaintiff filed suit in this court on June 18, 1998. *See* 26 U.S.C. § 6532(a)(1). In his complaint, plaintiff asserted that he was neither a "responsible person" nor "willful" in NMFI's failure to pay over the employment taxes, primarily because any payments made by the company at that time were made at the direction of the bankruptcy court overseeing NMFI's dissolution. Defendant answered and counterclaimed on November 18, 1998, demanding payment of the entire sec-

---

4. The partnership that owned the Dallas property included Mr. Cook and other initial investors in NMFI, therefore the judge deemed them internal creditors not independent entities entitled to payment during bankruptcy.

tion 6672 penalty, plus unpaid interest and collection fees and costs.

Subsequently, in the course of discovery, it was determined that plaintiff's IRS administrative file had been lost.[5] Plaintiff alleged that the loss of this file, and the concomitant loss of material establishing the historical factual basis for the IRS's assessment of the penalty against plaintiff, should alter, in his favor, various rules concerning the presumption of correctness and burden of proof ordinarily associated with a tax refund suit.[6] Following briefing and oral argument on this matter, this court, on February 25, 2000, ruled that the loss of the administrative file had altered these rules in two regards: (i) defendant had to show that a *prima facie* case for the assessment of the penalties exists, *i.e.*, that the assessment was not naked; and (ii) until that *prima facie* case was established, defendant would have the burden of proving its counterclaim. *Cook v. United States*, 46 Fed.Cl. 110, 113–19 (2000). Summarizing, this court concluded:

> Thus, in order to determine whether the presumption of correctness attaches to the assessment in question and to fix the burden of proof on the counterclaim, the defendant, rather than the plaintiff, shall present its evidence first (with appropriate cross-examination). The court will then rule as to whether the government's evidence provides the necessary foundation for the assessment. Following that ruling, the plaintiff, who retains the burden of proof on his complaint in this case, shall present his case in chief, with normal trial

procedures regarding the order of proof to be followed thereafter. *Id.* at 119. Pursuant to this ruling, the court conducted a pre-trial hearing on June 11, 2001, based upon which, the court found that defendant had produced sufficient evidence for the presumption of correctness to attach to the IRS's assessment. Trial on the merits thus proceeded with the standard presumptions and burdens regarding the conduct of a tax refund suit in place.

## II. DISCUSSION

Every employer is required to deduct and withhold federal income tax and Federal Insurance Contributions Act (FICA) tax from employees' wages as and when they are paid. *See* 26 U.S.C. §§ 3102 (FICA) and 3402(a) (income tax). Under section 7501 of the Internal Revenue Code, such amounts are held in trust for the United States and thus are commonly referred to as trust fund taxes. *See Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). In imposing the obligation to collect these taxes on other than the actual taxpayer, Congress recognized that collectors might fail to set aside and pay over the taxes to the United States. *See generally, United States v. Sotelo*, 436 U.S. 268, 277 n. 10, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978). Where, as here, the collector fails to remit the withheld taxes, the United States must nevertheless credit each taxpayer as if the funds were actually paid over. *See, e.g.*, 26 C.F.R. § 1.31–1(a) (2001). *See also Slodov*, 436 U.S. at 243, 98 S.Ct. 1778; *United States v. Huckabee Auto Co.*,

---

5. In his response to plaintiff's Motion to Compel, defendant's counsel stated:
   > Counsel for defendant is not currently in possession of the IRS Administrative File and after an exhaustive search and communications with the various IRS and Department of Justice employees who may have had possession of the Administrative File, counsel for defendant believes the IRS Administrative File relating to plaintiff to be lost.

6. In a plain vanilla refund suit, the assessment made by the Service is presumed to be correct and this places an obligation on the taxpayer to come forward with evidence to rebut a presumption of correctness. *United States v. Janis*, 428 U.S. 433, 440–41, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). Viewed in these terms, the presumption of correctness "is a

procedural device which requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination." *Rockwell v. Commissioner*, 512 F.2d 882, 885 (9th Cir.1975), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). In addition, a taxpayer in a refund suit also has the burden of proof—the ultimate burden of persuasion. *See Helvering v. Taylor*, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935). Where the presumption of correctness attaches to an assessment, the taxpayer generally also has the burden on any counterclaim raised by the government relating to the assessment. *See Adams v. United States*, 175 Ct.Cl. 288, 358 F.2d 986, 994 (1966). For a lengthier discussion of these principles, *see Cook*, 46 Fed.Cl. at 113–19.

783 F.2d 1546, 1548 (11th Cir.1986). As a consequence, the United States obligates itself to pay benefits such as social security and income tax refunds, for which there is no corresponding revenue. *See Emshwiller v. United States*, 565 F.2d 1042, 1044 (8th Cir. 1977) ("any failure by the employer to pay withheld taxes results in a loss to the government in that amount").

To protect against such losses, the persons responsible for ensuring that the trust fund taxes are paid, who willfully fail to do so, may be held personally liable under section 6672 of the Internal Revenue Code. *See* 26 U.S.C. § 6672; *see also United States v. Bisbee*, 245 F.3d 1001, 1005 (8th Cir.2001). Section 6672(a) states in pertinent part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). According to its terms, then, liability under section 6672 results from the confluence of three factors: "(1) There must be a 'person' who (2) is required to collect, truthfully account for and pay over taxes, but who (3) 'willfully' fails to do so." *Emshwiller*, 565 F.2d at 1045. *See also Vinick v. United States*, 205 F.3d 1, 3–4 (1st Cir.2000); *United States v. Landau*, 155 F.3d 93, 100 (2d Cir.1998), *cert. denied*, 526 U.S. 1130, 119 S.Ct. 1803, 143 L.Ed.2d 1007 (1999).

The first two requirements identified above are typically collapsed into the single concept of a "responsible person," while the willfulness criteria demands separate attention. Both the responsible person analysis and the assessment of willfulness are fact-based determinations unique to the circumstances of each individual case. *See Feist v. United States*, 221 Ct.Cl. 531, 607 F.2d 954, 957 (1979); *see also Bauer v. United States*, 211 Ct.Cl. 276, 543 F.2d 142, 148 (1976). An individual against whom the IRS has made a

section 6672(a) assessment ordinarily has the burden of proving, by a preponderance of the evidence, that one or both of the composite elements of liability under that section is absent. *See Landau*, 155 F.3d at 101. After carefully reviewing the evidence in this case, the court finds that it overwhelmingly demonstrates Mr. Cook was a responsible person at NMFI and that his failure to remit the corporation's payroll taxes was willful.

### A. Responsible Person

According to section 6671(b) of the Code, the term "person," as used in section 6672, "includes an officer or employee of a corporation ... who as such officer, employee or member, is under a duty to perform the act in respect of which the violation occurs." This definition of "person" is meant to protect the government fisc by facilitating the collection of taxes from those who have both the responsibility and authority to avoid the default. *See White v. United States*, 178 Ct.Cl. 765, 372 F.2d 513, 516 (1967). Responsibility then is a matter of substance not form and is determined by the coincidence of status, duty and authority. *See Mazo v. United States*, 591 F.2d 1151, 1156 (5th Cir. 1979), *cert. denied sub nom. Lattimore v. United States*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). As the Federal Circuit explained in *Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed.Cir.1984), the determining factor in whether an employee or corporate official is a responsible person is his or her "power to compel or prohibit the allocation of corporate funds." Thus, persons have been held to be responsible under section 6672 when they have the authority to: sign checks on behalf of the corporation; prevent the issuance of checks by denying a necessary signature; control the disbursement of the payroll; or control the voting stock of the corporation. *See Godfrey*, 748 F.2d at 1576. *See also Burack v. United States*, 198 Ct.Cl. 855, 461 F.2d 1282, 1291 (1972); *McCarty v. United States*, 194 Ct.Cl. 42, 437 F.2d 961, 968 (1971); *White*, 372 F.2d at 516–517; *LaCombe v. United States*, 1995 WL 761027 *3 (Fed.Cl.1995). Earlier, the Court of Claims announced that "[a]s a general proposition it may be safely postulated that one who is the

founder, chief stockholder, president, and member of the board of directors of a corporation ... is rebuttably presumed to be the person responsible under section [6672] of the Code," absent a showing "that in actual fact he lacked the ultimate authority to withhold and pay the employment taxes in question." *Feist,* 607 F.2d at 960 (quoting *McCarty,* 437 F.2d at 968).[7]

■ The record evidence reveals that Mr. Cook meets virtually every indicia of being a responsible person under section 6672(a). He was not only the founder and president of NMFI as well as a member of its board of directors, but also the controlling shareholder during all the quarters at issue and throughout most of the company's existence. He had the authority to sign checks and tax returns on behalf of the corporation and exercised that authority regularly. Although he alluded to delegating limited financial decision-making and check-signing authority to Ms. Combs, Mr. Cook testified that "the buck stop[ped] with me." *Cf. Teets v. United States,* 29 Fed.Cl. 697, 707–08 (1993), *aff'd,* 39 F.3d 1196 (Fed.Cir.1994)(table decision). As plaintiff's counsel acknowledged during the pre-trial hearing, on these facts there is little room to argue that Mr. Cook was not a responsible person capable of ensuring that NMFI met its employment tax obligations.

### B. Willfulness

Even a responsible person is not liable for a penalty under section 6672(a) unless his or her failure to collect, account for, or remit withholding taxes was willful. *Godfrey,* 748 F.2d at 1574. "Whether 'the failure to pay the overdue taxes [is] willful has been seen ... as calling for proof of a voluntary, intentional, and conscious decision not to collect and remit taxes thought to be owing—and

not as requiring a special intent to defraud or deprive the Government of monies withheld on its account.' " *Godfrey,* 748 F.2d at 1576–77 (alterations in original) (quoting *Scott v. United States,* 173 Ct.Cl. 650, 354 F.2d 292, 295 (1965)). The Supreme Court has indicated that willfulness requires some showing of "personal fault." *See Slodov,* 436 U.S. at 254, 98 S.Ct. 1778. "Mere negligence" is insufficient to constitute willfulness under section 6672. *Godfrey,* 748 F.2d at 1577. On the other hand, "it is not necessary that there be present an intent to defraud or to deprive the United States of the taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness." *White,* 372 F.2d at 521; *see also Ghandour v. United States,* 36 Fed.Cl. 53, 62 (1996) (same); *Monday v. United States,* 421 F.2d 1210, 1216 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970) (the individual's bad purpose or evil motive in failing to collect and pay the taxes "properly play no part in the civil definition of willfulness.")

■ Limning the appropriate standards to be applied herein, the Federal Circuit has held that willfulness may be shown in at least two ways: (i) "a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the [g]overnment" or (ii) "reckless disregard of a known or obvious risk that the taxes may not be remitted to the government." *Godfrey,* 748 F.2d at 1577, 1578. Decisions of the Court of Claims are to similar effect. *See Feist,* 607 F.2d at 961; *Bolding v. United States,* 215 Ct.Cl. 148, 565 F.2d 663, 672 (1977). Under the first of these prongs, a responsible person who pays net wages to employees with the knowledge that there are insufficient funds with which to pay the em-

---

7. Adopting these factors and a few others, other courts have essentially applied a seven-factor approach to determining whether one is a responsible person, including:

whether the person: (1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid,

(6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority.

*Fiataruolo v. United States,* 8 F.3d 930, 939 (2d Cir.1993). *Accord Vinick,* 205 F.3d at 7; *Barnett v. Internal Rev. Serv.,* 988 F.2d 1449, 1455 (5th Cir.1993), *cert. denied,* 510 U.S. 990, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993); *Denbo v. United States,* 988 F.2d 1029, 1032 (10th Cir.1993); *Brounstein v. United States,* 979 F.2d 952, 954–55 (3d Cir.1992); *Gephart v. United States,* 818 F.2d 469, 473 (6th Cir.1987).

ployment taxes commits a willful failure to collect and pay over under section 6672. *See Emshwiller,* 565 F.2d at 1045; *Sorenson v. United States,* 521 F.2d 325, 328 (9th Cir. 1975). Under the second of these prongs, a responsible person is reckless if he knew or should have known of a risk that the taxes were not being paid, had a reasonable opportunity to discover and remedy the problem and yet failed to undertake reasonable efforts to ensure payment. *See Whiteside v. United States,* 26 Cl.Ct. 564, 573–74 (1992); *Hammon v. United States,* 21 Cl.Ct. 14, 27 (1990); *see also Wright v. United States,* 809 F.2d 425, 427 (7th Cir.1987). Under this latter prong, "if the facts and circumstances of a particular case, taken as a whole, demonstrate that a responsible individual knew or should have known that there was a risk that the taxes would not be paid, and failed to take available corrective action, with the result being that the government is not paid taxes to which it is entitled, that individual will be found to have willfully failed to pay over withholding taxes under IRC § 6672(a)." *Ghandour,* 36 Fed.Cl. at 63.

■ In arguing that he did not act willfully, plaintiff does not contend—nor, in good faith, could he—that he had no knowledge of NMFI's obligation to remit withholding taxes. In fact, beginning in April 1989, and throughout the period in question, he signed IRS Forms 941 plainly indicating that NMFI was not meeting its withholding tax responsibilities. Nor does plaintiff assert that he lacked knowledge that NMFI's funds, including the withheld taxes, were being used to pay creditors other than the IRS. To the contrary, he not only authorized those payments, but also paid net wages to his employees fully knowing that amounts corresponding to the taxes that should have been withheld from those employees would not be paid over to the United States. Nonetheless, plaintiff claims that his actions were not willful because the bankruptcy court compelled him to use the company's available funds, first, for environmental clean up and, then, for the other expenses of operating the business. Even if this were not actually the case, he asserts that he subjectively believed it to be so at the time that he failed to remit the withholding taxes in question. Accordingly, he contends that he did not make a conscious, voluntary choice to pay other creditors instead of the United States and, as such, acted without personal fault.

With some prompting from the court, the parties, in briefing these contentions, have framed the debate here as requiring the court to decide whether willfulness is determined from an objective versus subjective standpoint. Plaintiff clearly emphasizes the latter perspective, which obviously favors his contentions, while defendant, albeit more indirectly and in muted terms, clearly analyzes the evidence more from an objective focus. In many ways, however, the objective/subjective debate is a false dichotomy, particularly on the facts of this case. To be sure, the decisions in the circuits run the gamut in defining wilfulness, with some formulations more explicitly relying on subjective terms than others.[8] Several circuits, indeed, have adopted hybrid "reasonable cause" exceptions that combine subjective and objective features. For example, in *Finley v. United States,* 123 F.3d 1342, 1348 (10th Cir.1997),

---

8. For cases that apply more subjective language *see Sawyer v. United States,* 831 F.2d 755, 759 (7th Cir.1987) ("The issue of willfulness in a § 6672 assessment case 'is necessarily directed to the state of the responsible person's mind, a subjective determination.'" (quoting *Mazo,* 591 F.2d at 1157)); *Turpin v. United States,* 970 F.2d 1344, 1350 (4th Cir.1992) ("Whether someone has acted willfully is an inquiry 'necessarily directed to the state of the responsible person's mind.'") (quoting *Thibodeau v. United States,* 828 F.2d 1499, 1505 (11th Cir.1987)). Cases with a more objective slant include: *Hochstein v. United States,* 900 F.2d 543, 549 (2nd Cir.1990) (plaintiff's "good faith belief that New York law required him to prefer employees over the feder-al government is not a defense to liability under section 6672"), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2967, 119 L.Ed.2d 587 (1992); *Thomsen v. United States,* 887 F.2d 12, 17–18 (1st Cir.1989) (A plaintiff may be found willful under section 6672 "even though the payments to the other creditors may have been made in good faith or even in the mistaken belief that the payments were required to be made in preference to payments to the government."); *Teel v. United States,* 529 F.2d 903, 906 (9th Cir.1976)("A mistaken belief on the part of the responsible person that the tax need not or cannot be paid over does not suffice to render the failure to pay nonwillful.")

the Tenth Circuit, sitting *en banc*, held that reasonable cause sufficient to excuse the failure to pay employment taxes existed when: "(1) the taxpayer has made reasonable efforts to protect the trust funds, but (2) those efforts have been frustrated by circumstances outside the taxpayer's control."[9] While the Court of Claims has vacillated on this point, at various times appearing alternately to reject and embrace a "reasonable cause" exception, *compare Burack*, 461 F.2d at 1292; *McCarty*, 437 F.2d at 969 *with White*, 372 F.2d at 522, that same court, in *Feist*, described willfulness in the following terms:

> Willfulness can be proved by showing that the responsible person recklessly disregarded his duty to collect, account for, and pay over the trust fund taxes or by showing that the responsible person ignored an obvious and known risk that the trust funds might not be remitted. The concomitant of this rule must be that absence of willfulness can be proved by an affirmative showing that the responsible person did *not* disregard his duties, and that he undertook all reasonable efforts to see that such taxes would in fact be paid, in circumstances where the employer had the means

of payment and could reasonably be expected to make the payment.

*Feist*, 607 F.2d at 961 (citations omitted). More recently, the standard for willfulness adopted by the Federal Circuit in *Godfrey* clearly incorporated subjective elements, indicating that to be willful, one must act "voluntarily" and "consciously," emphasizing further that "relevant evidence bearing on the element of personal fault may not be ignored." *Godfrey*, 748 F.2d at 1577.

Plaintiff's flagship claim is that the bankruptcy judge's emphasis on cleaning up NMFI's environmental problems "effectively" compelled him not to pay any other expenses including the company's trust fund tax obligations. "Effectively" is the loaded word in the prior sentence, as the bankruptcy court never explicitly ordered plaintiff or NMFI to disregard the company's withholding tax obligations.[10] Indeed, while the bankruptcy court, on several occasions, acceded to requests made by plaintiff to authorize particular expenditures, for example, expenditures to operate NMFI's Dallas plant, neither plaintiff nor his attorneys, during formal hearings or informal conferences, ever raised the withholding tax issue with the court. They thus sought neither clarification as to whether the court wanted those taxes

---

9. Similarly, the Second Circuit has recognized that "a responsible person's failure to cause the withholding taxes to be paid is not willful if he [or she] believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one." *United States v. Rem*, 38 F.3d 634, 643 (2d Cir.1994). *See also Turpin*, 970 F.2d at 1350. Other circuits, however, have forcefully rejected this formulation. *See Monday*, 421 F.2d at 1216 ("The standard of willfulness should not be construed to include lack of 'reasonable cause' or 'justifiable excuse.' ... [These concepts] invite consideration of such misleading and improper factors as the financial condition of the business or the demands of creditors.").

10. Thus, for example, Mr. Cook testified:

Q: Let me just restate the question then. So it is your testimony—
A: Yes.
Q: —that the bankruptcy judge ordered National Metal not to comply with the applicable Internal Revenue laws and continue to pay the payroll taxes when they were due.
A: That was not your original question, sir, and—
Q: That is my question now.
A: Okay, if that's your question, I will say no. And, Dean Fuller, one of NMFI's lawyers, stated that "I don't recall specifically what the Court wanted done. I recall the Court placing an emphasis on the environmental issues, because they were a big issue in the case. I don't recall a specific order one way or the other, instructing one to be paid over the other or otherwise, not specifically." In a similar vein, Ms. Edmonson, Cook's former wife, indicated that the withholding taxes were "never discussed" with the bankruptcy court.

Arguably, the bankruptcy judge could not lawfully have made such an order had the IRS been able to establish a sufficient nexus between the trust funds owing and property in the possession of the company. *See Begier v. Internal Rev. Serv.*, 496 U.S. 53, 55, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (establishing that pre-petition payments of trust fund taxes cannot be avoided as preferences because § 7501 creates a trust held for the benefit of the IRS the corpus of which is not part of the property of the debtor nor the property of the estate). The court, of course, need not reach this issue.

paid nor leave to make those payments. Instead, the record reveals that plaintiff took steps actively to conceal the nonpayment of the withholding taxes from the court. Thus, while NMFI's pre-petition documents listed the trust fund debts, the monthly financial statements that plaintiff filed with the bankruptcy court left blank the columns indicating whether post-petition "federal payroll taxes" were due and owing. Nor were such withholding taxes referred to in the proposed plan of reorganization that NMFI filed with the court on March 6, 1990, NMFI's first amended plan of reorganization filed May 18, 1990, or the disclosure statements filed with respect to those plans. And, contrary to his claims before this court, plaintiff was not acting on the advice of counsel. *Cf. Gray Line Co. v. Granquist*, 237 F.2d 390, 395 (9th Cir.1956), *cert. denied*, 353 U.S. 911, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957). Thus, Dean Fuller, one of NMFI's bankruptcy counsel, testified not only that he did not recall ever instructing Mr. Cook not to pay the corporation's taxes, but that he "certainly" would never suggest to a client that they pay creditors with withholding taxes "without having some instruction or the judge okaying that procedure."[11] The record thus reveals that, at the very least, Mr. Cook failed to take reasonable action either to clarify the bankruptcy court's orders or to seek to have the bankruptcy court authorize the payments. Not coincidentally, this course of conduct was exceedingly convenient, for as long as he remained blissfully ignorant of the court's true intentions, Mr. Cook could continue to use the withheld taxes to pay employees and other creditors in a last ditch effort to preserve NMFI as a going concern.

On these facts alone, which are solidly anchored to the record, Mr. Cook's actions here manifestly were willful. *Cf. Sorenson*, 521 F.2d at 329 (holding that an individual was willful: "If [Sorenson] did not understand his responsibilities it is because he did not ask those who could have informed him; and if he did not ask we are inclined to believe that was because he preferred ignorance"). While, as the Seventh Circuit colloquially put it, a responsible person cannot avoid liability by "adopting a 'hear no evil—see no evil' policy," *Wright*, 809 F.2d at 427, the same holds true of an individual who, like old Dobbin, views his withholding responsibilities by donning a combination of blinders and rose-colored glasses. *See also Teets*, 29 Fed.Cl. at 712. In short, because he took no steps to clarify his obligations or to obtain authorization to pay that which he knew was owed, Mr. Cook's asserted good faith belief that the bankruptcy court had precluded him from paying the withholding taxes does not constitute a shield against the imposition of the section 6672(a) penalty. *Cf. Hochstein*, 900 F.2d at 549 (holding controller willful even though he thought he was required by state law to pay net wages, stating "an individual's good or bad motive in failing to collect and pay taxes is irrelevant to the willfulness determination").

The foregoing, however, considerably overstates plaintiff's case. On the whole, this court believes that it is far more likely than not that plaintiff did not even subjectively believe that the bankruptcy court had precluded the payments. Various evidence fortifies this conclusion. First, there are the

---

11. Regarding this point, Mr. Fuller testified:

Q: In terms of how you would be pursuing a bankruptcy matter at that time, would you have ever, for example, recommended to a client that they take money that they've withheld from employees and pay another creditor with it?

A: As a lawyer, I certainly wouldn't do that without having some instruction or the judge okaying that procedure?

Q: And why would you not have instructed a client to do that?

A: Well, because obviously the 941s are important to be paid. Withholding taxes are essential to be paid, and the Government's entitled to their money and that somebody could be individually liable as well, is my understanding, and I wouldn't want that circumstance to occur. And if that money is for purposes of taking care of the taxes on the payroll for the Government, then I certainly wouldn't typically tell a debtor-in-possession to use those funds without court authorization to do so.

Q: And when you say, typically, is it your understanding that was your sense of the law back in 1989 and 1990 as well?

A: Yes, I would say that.

Mr. Fuller later indicated, in reference to a typical bankruptcy, that "the Court certainly wants to see that your post-petition obligations are being paid."

monthly financial statements discussed above—if Mr. Cook sincerely believed that the bankruptcy court had ordered him not to pay over the withholding taxes, then why would he conceal NMFI's mounting withholding tax obligations from the court? Yet, he did. And, there is no doubt that he knew exactly what was happening, as Ms. Combs, NMFI's bookkeeper, testified that she ran a financial statement for him each month which showed the tax liability growing. Further, Mr. Cook's conduct in dealing with the filing of NMFI's Forms 941 also is suspicious and strongly suggests that he knew something was amiss. Prior to the period in question, Ms. Combs prepared and supplied these forms to Mr. Cook for his signature; he signed them and they were timely filed. Mr. Cook described her as being "meticulous" in this practice. But, during the periods in question, Mr. Cook failed to file these forms on a timely basis and when they were filed, months after the due dates, the line indicating the amount of tax deposited was either left blank or struck through. At trial, plaintiff did not explain why, if he sincerely believed that the bankruptcy court had precluded him from paying the withholding taxes, he did not file the Forms 941 on a timely basis. Finally, it stretches credibility beyond the breaking point to suggest that Mr. Cook, allegedly worried that the tax debts were accumulating and believing that the bankruptcy court was prohibiting him from paying those amounts, would not have sought a clear assurance from that court confirming his practice of using the withheld taxes for other purposes. Given the telltales that permeate this record, the court thus totally discounts, as incredible, plaintiff's self-serving testimony that he subjectively believed that the bankruptcy court had effectively ordered him not to pay over the withholding taxes.[12]

■ A like use of blinders underlies plaintiff's fall-back position—that the bankruptcy court left no unencumbered funds from which he could pay the outstanding taxes. To be sure, some courts have held that if an individual becomes a responsible officer after a withholding tax accrues, that person is not willful if all the available funds to pay the tax are encumbered. *See, e.g., Slodov,* 436 U.S. at 259–60, 98 S.Ct. 1778; *Kenagy v. United States,* 942 F.2d 459, 465 (8th Cir.1991). Along similar lines, the Federal Circuit has held that a responsible person need not "order the impossible." *Godfrey,* 748 F.2d at 1577; *see also Ghandour,* 36 Fed.Cl. at 62. But that is far cry from the case *sub judice* for at least two reasons. First, Mr. Cook was a responsible officer at the time the taxes in question accrued and were not paid over—he is willful here not simply because he failed to use subsequently acquired funds to pay outstanding taxes, but also because, in paying net wages, he failed to withhold and pay over taxes as they accrued. Second, while the bankruptcy court clearly encumbered some of NMFI's funds through the use of a cash collateral account and by ordering the payment of certain expenditures, that court just as clearly left Mr. Cook with discretion to use the remainder of the company's funds to pay the business's operating expenses.[13] That in selecting which expenses

12. The court rejects Mr. Cook's testimony on this point based not only on the contradictory evidence in the record, but also because, at trial, he gave evasive answers and, at a minimum, tended to shade the unvarnished truth. For example, in cross-examination, he first asserted that the bankruptcy judge had "in so many words alluded to the fact" that the payroll taxes would be paid later, indicating that the matter was discussed not in the courtroom, but in a "sideroom." As his cross-examination proceeded, he maintained this view even when read his deposition testimony—there, he had indicated that the payroll tax "was not an issue that was discussed"—rejecting that testimony and stating instead that he wanted to "amend my answer." Ultimately, however, as discussed above, he abandoned that position. Indeed, when the court, at the conclusion of his testimony, point-blank asked "Did Judge Abramson ever explicitly—so I'm not talk[ing] about generically or categorically or by some indirect reference, but ever explicitly discuss with you the employment taxes that were unpaid for 1989 and 1990," he answered "no." Mr. Cook gave similarly shifting testimony regarding his lawyer's advice, at some points suggesting that he had repeatedly sought advice from his attorneys but not received it; at others, testifying that his attorneys had told him not to pay these taxes; and at one point testifying, seemingly contrariwise, that "it was our attorney's opinion that the cash collateral received by the bank was sufficient to pay your [sic] payroll taxes."

13. As indicated, as early as June 2, 1989, and no later than June 27, 1989, the only legal obligation imposed on NMFI's funds was the order

would be paid, Mr. Cook chose, as he described it, to prioritize payments "that would generate income," does not excuse his failure to discharge his withholding tax obligations. Accordingly, contrary to plaintiff's claims, NMFI's funds were not encumbered in such a way that their use for purposes other than paying the delinquent taxes would not be willful. See United States v. Kim, 111 F.3d 1351, 1361 (7th Cir.1997) (payment of unsecured creditors establishes that funds are not encumbered); Purcell v. United States, 1 F.3d 932, 938–39 (9th Cir.1993) (deciding that the company's funds were not "encumbered" by a security interest when there was still flexibility on the use of the funds).

Rather than paying net wages, Mr. Cook's duty in this situation was "to prorate such funds as [were] available between the Government and the employees." Sorenson, 521 F.2d at 328.[14] In arguing to the contrary, plaintiff relies heavily on Kinnie v. United States, 994 F.2d 279 (6th Cir.1993). That case, however, cuts the opposite direction. In Kinnie, the plaintiff asserted that his liability under section 6672 should be limited to the amount of cash his corporation had on hand on the date that he acquired notice that trust fund taxes were outstanding. Id. at 284. In rejecting that proposition, the Sixth Circuit distinguished Mr. Kinnie's situation from that of the plaintiff in Slodov. As noted above, in Slodov, 436 U.S. at 259–60, 98 S.Ct. 1778, the Supreme Court held that a responsible person who assumes control after the accrual of the trust fund taxes does not violate section 6672 by willfully using funds to pay other creditors when at the time he became a responsible person there were no funds with which to satisfy the tax obligation and the funds later generated were not directly traceable to collected taxes. Part of the rationale for the Slodov decision was to

avoid discouraging potential new managers or investors of a financially troubled corporation from attempting to salvage the business and thereby enable the government to collect more in delinquent taxes than if the operation folded. See Slodov, 436 U.S. at 253, 98 S.Ct. 1778; Kinnie, 994 F.2d at 285. That rationale did not apply in Kinnie where, as here, the plaintiff was an original investor, a responsible person at all times during which the tax delinquency accrued and evidenced personal fault by failing in his on-going responsibilities toward the trust funds. Kinnie, 994 F.2d at 285. The Sixth Circuit determined that Kinnie's payments to creditors and employees in amounts significantly greater than the tax debt outstanding indicated that sufficient unencumbered funds existed to resolve the tax delinquencies and therefore Mr. Kinnie was liable under section 6672. Id. Such is also the case here.

## III. CONCLUSION

That ends this matter. Plaintiff is correct in asserting that the penalty structure imposed by section 6672(a) is relatively rigid and unyielding; Congress intended it to be so to discourage officials of floundering companies from being tempted to use withheld taxes to stave off creditors. Here, Mr. Cook readily succumbed to that temptation, thereby triggering the penalty provision—"[i]f a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent." Ellis v. United States, 206 U.S. 246, 257, 27 S.Ct. 600, 51 L.Ed. 1047 (1907) (Holmes, J.). Mr. Cook was responsible for paying the withheld taxes over, he willfully failed to do so and, therefore, he is

---

that gave the company's secured creditor access to 25 percent of a cash collateral account. The company had unfettered access to the remaining 75 percent of this account, which it was authorized to use for its ordinary business operations. And, as of December 1, 1989, the bankruptcy court ordered that plaintiff could use 87.5 percent of the collateral account for its operations. NMFI's tax returns indicate that it paid out more than $500,000 in wages between 1989 and 1990 and paid at least $170,000 in business expenses in 1989 alone.

14. See also Hochstein, 900 F.2d at 548 (rejecting argument that controller was not willful because his superior provided him only with enough funds to pay net wages); Collins v. United States, 848 F.2d 740, 742 (6th Cir.1988) (plaintiff's decision to pay wages and other suppliers when he knew of tax deficiency made his action willful); Emshwiller, 565 F.2d at 1045 (payment of net wages with knowledge that no funds existed to pay taxes was willful failure).

liable for the 100 percent penalty assessed under section 6672(a) of the Code. As such, the Clerk is directed to enter judgment dismissing plaintiff's complaint and granting defendant's counterclaim in the amount of $97,976.00, plus interest and costs.