Jose D. SALZILLO, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 02–1393T.

United States Court of Federal Claims.

April 4, 2005.

---

Charles J. Muller, III, and Farley P. Katz, Strasburger & Price, LLP, San Antonio, Texas, for plaintiff.

Benjamin C. King, Jr., United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General Eileen J. O'Connor, for defendant.

## OPINION

ALLEGRA, Judge.

"Law, being a practical thing, must found itself on actual forces.... If it should do otherwise, it would become a matter for pedagogues, wholly devoid of reality." [1]

This tax refund case is before the court following trial in San Antonio, Texas. At issue is whether plaintiff is liable for a so-called "responsible officer" penalty imposed by section 6672(a) of the Internal Revenue Code of 1986 (26 U.S.C.). Plaintiff paid $12,667.00 of this penalty and seeks a refund; defendant has counterclaimed for the balance of the assessment, $541,097.07, plus interest. For the reasons that follow, this court concludes that plaintiff is not liable.

## I. FINDINGS OF FACT

### A. Basic Findings

Star Food Processing, Inc. ("Star Foods") was a corporation primarily engaged in manufacturing food products under federal government contracts. The former president of Star Foods, Mr. L.C. Robbins, Jr., became involved with the company in 1983. At that

---

1. Oliver Wendell Holmes, Jr., The Common Law    213 (1881).

time, Star Foods lacked sufficient capital to expand its business and Mr. Robbins purchased approximately two million dollars in equipment to lease to the company. The business, nonetheless, continued to flounder and, in or around March of 1986, shortly before Star Foods filed for bankruptcy, Mr. Robbins became directly involved in the business. During the summer of 1986, he assumed the title of president, remaining so through the end of the company's operations. As president, by his own admission, Mr. Robbins was the only person authorized to negotiate large corporate purchases, contracts, and loans; open and close corporate bank accounts; guarantee or co-sign corporate bank loans; and determine company financial policy.[2] Initially, in 1986, he owned a 11–percent share of the company.

For a while, the fortunes of the company brightened: Mr. Robbins obtained additional funding and by carefully monitoring and controlling the company's expenditures, allowed Star Foods to emerge from bankruptcy and remain profitable from 1988 through most of 1994. But, dark economic clouds gathered anew. Star Foods had failed to diversify its revenue stream, which was almost entirely dependent upon government contracts for operational rations. Orders for those rations dropped precipitously in 1994, as the result of base closures. Yet, Star Foods was required, under other government contracts, to maintain the capacity to produce massive quantities of so-called "war stopper items" on very short notice, i.e., within 75 days. With revenue dropping and expenses not, the company, from 1994 through 1998, increasingly experienced cash flow problems, in due course leading it to file a second bankruptcy petition, this time in March of 1998. At the time this petition was filed, Mr. Robbins owned 23 percent of the company. By May of 1999, the company's financial situation had considerably worsened, with the company experiencing severe cash flow shortages, leav-ing it unable to pay all its debts as they came due.

Meanwhile, in 1995, the plaintiff, Jose Salzillo, joined Star Foods as a staff accountant, reporting to the then head financial officer, Mr. Felix Ramos. Mr. Ramos left around 1995. In 1996 or 1997 (the record does not disclose which), Adam Chessler, who Mr. Robbins described as a "money hunter," effectively became the company's chief financial officer, albeit for less than a year. He owned around 5,000 shares in the company. Mr. Chessler had signature authority over the corporate bank accounts, prepared detailed financial reports for Mr. Robbins and the board of directors, and oversaw the department that prepared the payroll reports and taxes. Owing to the company's limited funds, Mr. Chessler frequently made recommendations to Mr. Robbins as to which bills should be paid—toward this end, Mr. Salzillo prepared for Mr. Chessler periodic reports reflecting the company's cash status and a list of creditors. Those reports were reviewed by Mr. Chessler and eventually forwarded to Mr. Robbins. After Mr. Chessler left, Mr. Kirk Nessman was hired, as a consultant, to acquire additional funding for the company. He left in mid to late 1998. From the time he was hired, through 1998, plaintiff successively reported first to Mr. Ramos and then to Mr. Chessler. During the periods when the position of chief financial officer was vacant, Mr. Salzillo reported directly to Mr. Robbins.

During 1997, Mr. Howard Hastings became the clearing agent for Star Foods' government contract payments. Under a factoring arrangement approved by the bankruptcy court, the revenue from these contracts was received by Frost Bank, which siphoned off a portion of the revenue to pay down debt owed by the company. Mr. Hastings received the balance of the proceeds, from which he deducted sums owed to investors who had advanced money

---

**2.** Much of the information about Mr. Robbins authority derives not only from testimony, but also from details obtained by the IRS during an interview of Mr. Robbins. On August 16, 2000, IRS Revenue Officer Nelda Perales met with Mr. Robbins and Ms. Valerie Paugh, an enrolled agent who assisted Mr. Robbins with his person-al tax returns. After Ms. Perales questioned Mr. Robbins, she filled out an interview report to reflect his answers. Mr. Robbins reviewed the report and then signed it, certifying that "I declare that I have examined the information given in this statement and, to the best of my knowledge and belief, it is true correct and complete."

to Star Foods for supplies and other purposes. The remaining balance was then deposited into Star Foods' account. Mr. Hastings also directed the activities of an entity called Symrel, in which individuals invested funds that were used primarily to purchase supplies provided to Star Foods on credit. On numerous occasions, Symrel advanced funds to Star Foods to pay creditors or meet payroll. As to the latter, under an arrangement authorized by Mr. Robbins, plaintiff would contact Mr. Hastings, who would issue a check that, in turn, would be cashed, with the proceeds used to cash checks for employees.

In the latter part of 1998, Mr. Robbins hired Mr. Harlan Vanderzee, who was primarily responsible for gathering documents and information required for the second bankruptcy court proceeding. Mr. Vanderzee also developed a system for capturing, and quickly reporting to Mr. Robbins, the daily costs of production, comparing the actual cost of production items, such as raw material and meat, against the budgeted cost. Despite defendant's claims to the contrary, Mr. Vanderzee also issued various checks during 1998 and 1999.

At about the same time, Mr. Robbins and the Board of Directors promoted plaintiff to Vice President of Finance and Chief Financial Officer, raising his annual salary from $56,000 to $72,000. Plaintiff, however, neither obtained a position on the board nor any interest in the corporation—indeed, Mr. Robbins indicated that he had to convince the Board to promote the relatively inexperienced Mr. Salzillo. Before taking this promotion, plaintiff knew that Star Foods was in bankruptcy and had significant financial problems, among which were difficulties in paying its employment taxes. Plaintiff's duties during this period included performing all types of accounting functions—supervision of accounts payable, accounts receivable and payroll—including preparing various reports for Mr. Robbins and the board; dealing with major suppliers and customers; opening and closing corporate bank accounts; signing and countersigning corporate checks; making or authorizing bank deposits; and performing various payroll functions.[3] Mr. Salzillo supervised three payroll and accounting clerks who worked for Star Foods; he interviewed and hired two of them, although only after receiving authorization from Mr. Robbins.[4] Throughout 1999 and 2000, Mr. Robbins dedicated a substantial portion of his time to finding a buyer for the company.

Much of the trial testimony focused, generally, on how Star Foods used its limited funds to pay particular creditors, and, specifically, on who controlled whether federal employment taxes would be paid. The record reveals that Mr. Salzillo frequently presented Mr. Robbins with cash balance reports and discussed with him the financial position of the company. Usually on Wednesdays, plaintiff presented Mr. Robbins with an accounts payable report, listing the outstanding creditors of the company and the amounts they were owed. After considering plaintiff's recommendations, Mr. Robbins would check off which creditors were to be paid, modifying the amount if less than the full amount owed was to be paid. Effectuating these decisions, Mr. Salzillo would then prepare or have prepared the appropriate checks, which would either be signed by Mr. Robbins, Mr. Salzillo or some other signatory; sometimes Mr. Salzillo or others would stamp Mr. Robbins' name thereon.[5] The record reveals

3. As in the case of Mr. Robbins, much of this information derives from an interview of Mr. Salzillo that the IRS conducted. On June 20, 2000, Nelda Perales of the IRS met with plaintiff, and filled out an interview report. The copy of that report submitted for trial is not signed by plaintiff, but Mr. Salzillo verified, at trial, that he had previously reviewed the report and that it accurately captured the substance of his interview.

4. Mr. Salzillo did not have the independent power to hire and fire employees. Indeed, when asked, in his interview with the IRS, about the hiring and firing of employees, Mr. Robbins indicated that only he, his brother, Joel Robbins, and a third individual, Jeff Bryant, had such authority. Mr. Robbins did not list Mr. Salzillo even though, in the same interview, he referred to him as having various other powers.

5. Plaintiff was a signatory on the Nations Bank account, which was opened June 16, 1999, on the Camino Real Bank account, which was open August 30, 1999 and closed June 20, 2000, and on the Frost National Bank account as of March 3, 1999. In fact, plaintiff opened some of these account at the direction of Mr. Robbins. After

that this practice was relaxed for checks in smaller amounts, for essential items, such as utilities, or for other items regularly used in production. Larger checks, particularly those targeted to overdue debts unrelated to production, could not be issued without Mr. Robbins' express approval. Plaintiff testified that around two hundred checks were issued by company officials each month. During the periods in question, Mr. Robbins also made critical decisions regarding which employees would be asked to go without their pay; directed that health insurance premiums not be paid, causing the policy to lapse; and either directed that child support payments not be forwarded to the appropriate agencies or sent checks to such agencies that were returned for insufficient funds.

During the periods in question, Star Foods' payroll and tax operations operated as follows: Ms. Sanchez, who worked for Mr. Salzillo, compiled a general ledger report for payroll on a weekly basis, which included what tax deposits were required based on the payroll checks. She individually typed the checks to the IRS for employment taxes, ready for Mr. Robbins' signature. Plaintiff reviewed these forms with Ms. Sanchez before presenting them to Mr. Robbins to sign. On various occasions in 1999 and 2000, Mr. Robbins either directed that these checks not be signed or otherwise refused to release the checks corresponding to the tax payments.[6] At least as early as of May of 1999, Mr. Salzillo began frequently reminding Mr. Robbins that the tax deposits were not being made weekly, and Mr. Robbins plainly was aware that the unpaid taxes were accumulating based, *inter alia*, on the quarterly tax returns that he reviewed, several of which he ordered not to be filed. On numerous other occasions, Mr. Salzillo urged Mr. Robbins to make payments to the IRS, with several such discussions escalating into shouting matches. While Mr. Robbins authorized some tax payments, more frequently he

chose to favor other creditors at the expense of the IRS, in an effort to keep the business afloat. The record reveals that he had a number of incentives for doing so. For example, under the reorganization plan before the bankruptcy court, if the company emerged from bankruptcy, his interest in Star Foods would have risen to a controlling 51 percent. Mr. Robbins particularly stood to benefit if the corporation was sold as a going concern—his testimony revealed that the company was estimated to be worth approximately $7.6 million if sold as an operating entity, but only $4.1 million in an asset sale. Finally, Mr. Robbins had an incentive to keep the business running because several of his employees were family members; his brother, for example, was the head of plant production and a brother-in-law also worked for the company.

As a result of Mr. Robbins' decisions, either no or partial tax deposits were made for the last three quarters of 1999 and the first three quarters of the year 2000. Critically, the record reveals that on at least one occasion, plaintiff attempted to pay the IRS, but was thwarted by Mr. Robbins. Thus, in December 1999, without Mr. Robbins' knowledge or approval, plaintiff wrote and sent to the IRS a check in the amount of $50,000. Shortly after this check was mailed, Mr. Robbins asked Mr. Salzillo what the cash balance was in Star Foods' main account and was informed that the current balance was approximately between $53,000 and $57,000. When Mr. Robbins asked Mr. Salzillo to write a check for a load of meat needed for that week's production, Mr. Salzillo finally informed him that he could not, because the money in the account had been earmarked to cover the IRS check. Mr. Robbins became irate and ordered Mr. Salzillo to wire the money to the meat supplier instead. He admonished Mr. Salzillo never to write a check to the IRS again. An IRS ledger

---

becoming vice president, plaintiff possessed, for a while, a rubber stamp of Mr. Robbins signature. This stamp was used on at least one Form 941 and on payroll checks.

**6.** As to the forms 941, Mr. Robbins testified that he did not sign the one for taxable period ending June 30, 1999, which indicated zero for deposits

and $107,690.77 for balance due. Mr. Robbins testified that the signature on this form came from a facsimile stamp that plaintiff had in his possession. Mr. Robbins testified that he signed the returns for the taxable periods ending September 30, 1999, December 31, 1999, March 3, 2000, June 30, 2000, and September 30, 2000.

confirms that a check for $50,000 was received around this time, but that the check was returned for insufficient funds. As a further means of preventing Mr. Salzillo from sending out any checks without his permission, Mr. Robbins seized (or had seized) from Mr. Salzillo the signature stamp he had previously used to sign checks on Mr. Robbins' behalf.

Cognizant that he could be held liable, plaintiff did not resign when the payroll taxes remained unpaid because, according to his testimony, he wanted to stay and ensure that Mr. Robbins made the payments after the company was sold.[7] Ms. Sanchez testified that had plaintiff made any payments other than those directed to production related costs, Mr. Robbins would have threatened to fire him, but, given the company's dire circumstances, probably would not have done so. There is no indication that, during this period, plaintiff threatened to resign if the taxes were not paid. During the periods in question, plaintiff attended at least three to four board meetings, but never raised the unpaid trust fund tax liability, believing that Mr. Robbins already had informed the board of this matter. Consistent with this view, Mr. Robbins testified at trial that Mr. Salzillo did not conceal anything from the board.

On October 22, 2001, the IRS assessed against plaintiff a penalty of $554,003.07 pursuant to section 6672 of the Code, for failure to pay over withheld employment taxes for the following calendar quarters and amounts:

| Quarter ending | Payroll Tax |
| --- | --- |
| March 31, 1998 | $ 8,785.17 |
| June 30, 1999 | $103,598.96 |
| September 30, 1999 | $118,047.63 |
| December 31, 1999 | $134,072.11 |
| March 31, 2000 | $ 93,805.27 |
| June 30, 2000 | $ 77,240.08 |
| September 2000 | $ 18,453.85 |

On November 14, 2001, plaintiff paid $239, representing the income tax and Federal Insurance Contributions Act (FICA) amount withheld from one employee for the first quarter of 2000. On the same day, he filed a claim for refund with the IRS for $239, plus interest on such amount as provided by law. On or about March 4, 2002, the IRS applied plaintiff's tax refund from the year 2001 in the amount of $12,428, to the assessed penalty for the first quarter of 1998, which amount exceeded the withheld taxes for a least one employee for that quarter. On March 28, 2002, plaintiff filed a claim for refund with the IRS for $12,428, plus interest on such amount as provided by law. By notices of disallowance dated April 3, 2002, the IRS notified plaintiff that it disallowed his claims for refund of $239 and $12,428, respectively.

On October 11, 2002, Mr. Salzillo filed the instant refund suit, in which he asserts that he was neither a "responsible person" not "willful" in Star Foods' failure to pay over employment taxes, primarily because plaintiff did not have the power to effectuate such payment. On April 3, 2003, the government filed a counterclaim to recover the remaining unpaid taxes, an amount of $541,097.07, plus interest, and all costs, fees, and expenses allowed by law. On June 2, 2003, Mr. Robbins agreed to a judgment in favor of the IRS, in satisfaction of his liability under section 6672(a) of the Code. On May 13, 2004, the parties filed a joint stipulation that the government is not entitled to recover from plaintiff for the quarter ending March 31, 1998. They further stipulated that to the extent any of the payments or credits have been applied to the 100 percent penalty assessment for the quarter ending March 31, 1998, the plaintiff is entitled to a credit in that amount against the 100 percent penalty assessments for the other quarters at issue. Trial in this matter was conducted in San Antonio, Texas, on May 17 and 18, 2004. As of the date of his testimony, Mr. Robbins had

---

7. In this regard, plaintiff convincingly testified: Mr. Robbins assured me that these taxes were going to be paid through the sale of the company, and he was in the process of selling some of the property that the company owned. And he reassured me that these taxes would be paid. So, based on his word, I stayed on. And I guess to sort of make sure that this did happen, I wanted to be there to do whatever I could to ensure that that—you know, these taxes were paid.

made no payments toward the June 2, 2003, judgment.

## B. Credibility Findings

A few words are in order regarding certain credibility findings that underlie the foregoing findings. Specifically, the court finds that significant portions of the testimony of two witnesses—Mr. Robbins and Ms. Crippen—are not worthy of belief. Mr. Robbins, the former president of Star Foods, was particularly evasive, and certainly less than forthcoming, in describing his role in managing the company and selecting which creditors would be paid. Key points in his testimony were contradicted by his own prior statements, including those given in a August 2000 interview with the IRS. The testimony of Ms. Crippen, Mr. Robbins' long-time assistant, is likewise incredible, largely because she inexplicably attempted to corroborate assertions made by Mr. Robbins that are counterfactual. While the court's findings in this regard are based not only upon the totality of the record, but also the demeanor of these witnesses, a medley of factual examples serves to illustrate why the court lacks confidence in their testimony.

Reminiscent of the old South Side Levee political slogan, Mr. Robbins was evasive early and often. Asked, at the outset of his testimony, whether he had reacted angrily to the service of the subpoena for his deposition in this case, Mr. Robbins matter-of-factly answered "no." Yet, when asked whether he had "crumpled the subpoena up," Mr. Robbins was equivocal, responding, "[t]hat's not the full—whole story, so I don't really have a yes or no answer for you there." After recalling a number of specific details regarding how he was served (*e.g.*, where he was positioned relative to the service processor, what he initially did with the subpoena, and his wife's reaction), Mr. Robbins allegedly could not recall whether he had crumpled the subpoena up, only going so far as to admit that he "could have" done so as he was "very excited for sure." Of course, whether Mr. Robbins actually crumpled the subpoena up has limited relevance. But, the sinuous approach he employed in answering these questions foreshadowed how he would testify on many critical topics involving his control over the business, and, particularly, how various payments found their way to creditors other than the IRS.

At points, Mr. Robbins plainly indulged in casuistry. Asked, regarding various types of bills, whether he had made "decisions" or "decided" that certain creditors were to be paid, and others not, Mr. Robbins, in most instances, could not bring himself initially to admit as much. In some instances, he offered that he had not made "decisions," but merely agreed to recommendations made by others. In other instances, for example, with respect to the nonpayment of child support or insurance premiums, he cavalierly testified that he had not made a "decision" to refrain from paying those bills because no money was available to make those payments—acting as if it was some third party, rather than he, who had carefully monitored the company's cash situation and chosen to expend moneys collected from his employees for other purposes, thereby leaving no funds available to make the payments for which these collections had been intended. In most instances—usually when faced with his prior deposition testimony or admissions he had made to the IRS—Mr. Robbins ultimately admitted, albeit begrudgingly, that he had the final responsibility to make such decisions.[8]

---

8. In one such line of questioning, Mr. Robbins answered, in typical fashion, as follows:

> Q: Did you ever direct that any employee not get a paycheck?
> A: There were certain employees, there were three or four employees that—I certainly told them we didn't have the money, could they hold on to their check before they—
> Q: All right.
> A: That's correct.

> Q: And did you also make a determination about whether or not health insurance benefits would be paid for?
> A: It was certainly a thing that didn't get paid sometimes, because we didn't have the money, yes.
> Q: Who made the decision about that?
> A: If you're looking for final responsibility, I guess it would rest here, yes sir.
> Q: And was there times when, for example, you couldn't make—pay over the child support payments, that various of your employ-

Mr. Robbins employed a similar approach in answering questions involving whether he had directed Mr. Salzillo not to pay payroll taxes over to the IRS. Thus, at one point, he testified, with a touch of hubris—

Q: All right. And you wouldn't dispute that in or about May of 1999, you were presented with a summary of the payroll, or a listing, and how much was due the IRS, and that you made the decision—told Jose Salzillo, we don't have this money, we can't pay the taxes. Is that—

A: That would not be a quote that came out of my mouth.

Q: I asked you if that was true or not.

A: That's not true.

Q: You say it's not true. Why did you say you would not dispute it at the time of your deposition?

A: Probably because the—it's going to be characterized as me being the last guy there. So, if I had that conversation, when Jose was advising me, if I would have—if I said something like that, it would be because of taking advice from a guy who was the closest advisor I had in the company, and I would have agreed with that.

These and other similar statements made by Mr. Robbins obviously were designed to inculpate Mr. Salzillo, that is, to portray him as a willing participant in a group decision not to pay the IRS. Yet, when Mr. Robbins was interviewed by the IRS in August of 2000, he not only answered that he was authorized to make payments of federal tax deposits, but, when asked if anyone else was so authorized, reportedly responded, "none."

Seeking to leave the impression that Mr. Salzillo, for inexplicable reasons, hid the company's mounting tax problems from him, Mr.

Robbins also testified that in the fall of 1999, he received a letter from the IRS indicating that Star Foods owed nearly $390,000 in overdue payroll taxes. He stated that the letter left him "shocked." Although excluded from the courtroom during this testimony, *see* Fed.R.Evid. 615, Ms. Crippen conspicuously described Mr. Robbins' reaction to the letter using the exact same word—"shocked." Yet, neither she, Mr. Robbins, nor the IRS could produce a copy of the letter in question, and, according to defendant's counsel, there is no reference to such a letter in any of the IRS' files. Nor was the letter apparently referenced in any corporate records, including the agendas and minutes of board meetings—this, though Mr. Robbins claimed that he had immediately brought the letter to the board's attention. Moreover, tellingly, a review of Star Foods' account ledger at the IRS suggests that in the fall of 1999, it did not owe the IRS anything remotely approaching $390,000, particularly, since the three quarterly returns for 1999, reflecting significant amounts due, were not filed, pursuant to Mr. Robbins instructions, until between *December of 1999 and August of 2000*—after the date the alleged letter was sent. And when asked during his August 2000 interview with the IRS, "[w]hen and how did you first become aware of the delinquent taxes?", Mr. Robbins mentioned neither the letter nor being shocked, but instead responded to the effect that "[d]uring '99 became aware several weeks had not been paid, was not surprised and continued." So, if Mr. Robbins was "not surprised," why was Ms. Crippen so convinced that he was "shocked." The answer may lie in her admission, under cross-examination, that she had a chance meeting with Mr. Robbins a week before trial, at which they had discussed the "letter" from the IRS and the fact

ees were required to make child support payments and you weren't able to pay over child support payments?

A: That was not something that came to me as a decision to make.

Q: You don't know whether or not that was the situation? Were there times when you were not able to pay over the child support payments?

A: I know there were times when they were paid and those checks bounced.

Q: You say that you never made the decision about that?

A: I'm saying that I don't recall making that decision about that. I may have said it in a deposition. If it's there, well, go ahead and-

Notably, when asked during his interview with the IRS, who made the decisions when there was not enough money to pay all the bills, Mr. Robbins indicated—"LC Robbins made decisions."

that Mr. Salzillo was denying its existence.[9] Setting aside whatever transpired at that meeting, to the extent Ms. Crippen's testimony tracks critical portions of Mr. Robbins' testimony that appear to be unreliable, her testimony is, as well, seriously tainted.

Finally, it should be noted that the court found Mr. Salzillo's testimony credible for at least two reasons: (i) in many key respects, his testimony was uncontroverted—a critical example is his testimony about the $50,000 payment he attempted to make to the IRS; and (ii) his testimony was corroborated, in large part, by Ms. Sanchez, who, by all appearances, had no incentive to color her testimony in the slightest. Ms. Sanchez, in particular, made clear the extent to which Mr. Robbins dominated the decision-making process regarding creditors, repeatedly reaffirming that it was Mr. Robbins, and not Mr. Salzillo, who made the decisions regarding the payment of payroll taxes.

## II. DISCUSSION

We begin with common ground. Every employer is required to deduct and withhold federal income tax and Federal Insurance Contributions Act (FICA) tax from employees' wages as and when they are paid. *See* 26 U.S.C. §§ 3102 (FICA) and 3402(a) (2000) (income tax). Under section 7501 of the Code, such amounts are held in trust for the United States and thus are commonly referred to as trust fund taxes. *See Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). In imposing the obligation to collect these taxes on other than the actual taxpayer, Congress recognized that collectors might fail to set aside and pay over the taxes to the United States. *See United States v. Sotelo,* 436 U.S. 268, 277 n. 10, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978). Where, as here, the collector fails to remit the withheld taxes, the United States must,

nevertheless, credit each taxpayer as if the funds were actually paid over. *See, e.g.,* 26 C.F.R. § 1.31–1(a) (2004); *see also Slodov,* 436 U.S. at 243, 98 S.Ct. 1778; *United States v. Huckabee Auto Co.,* 783 F.2d 1546, 1548 (11th Cir.1986). As a consequence, the United States obligates itself to pay benefits such as social security and income tax refunds, for which there is no corresponding revenue. *See Emshwiller v. United States,* 565 F.2d 1042, 1044 (8th Cir.1977) ("any failure by the employer to pay withheld taxes results in a loss to the government in that amount").

■ To protect against such losses, the persons responsible for ensuring that the trust fund taxes are paid, who willfully fail to do so, may be held personally liable under section 6672 of the Code. *See* 26 U.S.C. § 6672 (2000); *see also United States v. Bisbee,* 245 F.3d 1001, 1005 (8th Cir.2001). Section 6672(a) states in pertinent part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). By its terms, then, liability under section 6672 results from the confluence of three factors: "(1) There must be a 'person' who (2) is required to collect, truthfully account for and pay over taxes, but who (3) 'willfully' fails to do so." *Emshwiller,* 565 F.2d at 1045; *see also Vinick v. United States,* 205 F.3d 1, 3–4 (1st Cir.2000); *United States v. Landau,* 155 F.3d 93, 101 (2d Cir.1998), *cert. denied,* 526 U.S. 1130, 119 S.Ct. 1803, 143 L.Ed.2d 1007 (1999); *Cook v. United States,* 52 Fed.Cl. 62, 68 (2002).[10]

9. Questioned by the court during trial, defendant's counsel stated that he was unaware that this conversation had occurred. The court has no reason to doubt this statement. In its post-trial brief, defendant suggests that the testimony of Mr. Robbins and Ms. Crippen regarding the letter was corroborated by Ms. Sanchez. While Ms. Sanchez did recall a conversation in which Mr. Robbins was irritated at the amount of delinquent taxes owed, she made no mention that he

was upset with Mr. Salzillo and, in fact, essentially testified that she could not understand why Mr. Robbins would be irritated, given his control over, and knowledge of, the company's financial and tax matters.

10. Section 6672 originated as section 1308(c) of the Revenue Act of 1918, 40 Stat. 1143, which established a three-tiered scale of penalties for failing to comply with federal excise taxes. *See*

■ The first two of these requirements are typically collapsed into the single concept of a "responsible person," while the willfulness criteria commands separate attention. Both the responsible person analysis and the assessment of willfulness are fact-based determinations unique to the circumstances of each case. *See Feist v. United States*, 221 Ct.Cl. 531, 607 F.2d 954, 957 (1979); *Bauer v. United States*, 211 Ct.Cl. 276, 543 F.2d 142, 148 (1976). An individual against whom the IRS has made a section 6672(a) assessment ordinarily has the burden of proving, by a preponderance of the evidence, that at least one of the composite elements of liability under that section is absent. *See Landau*, 155 F.3d at 101; *Cook*, 52 Fed.Cl. at 68. And that burden squarely falls on plaintiff here.

### A. Was Plaintiff a Responsible Person?

Section 6672 of the Code adopts the term "person(s)" as used by section 6671(b), which, in turn, defines person as: "includes an officer or employee of a corporation ... who as such officer, employee, or member, is under a duty to perform the act in respect of which the violation occurs." Through section 6672 and the definition contained in section 6671(b), the government seeks "to protect the government fisc by facilitating the collection of taxes from those who have both the responsibility and authority to avoid the default." *Cook*, 52 Fed.Cl. at 68; *see also White v. United States*, 178 Ct.Cl. 765, 372

F.2d 513, 516 (1967). It is a further bedrock principle that the determination whether a person is responsible "is a matter of substance not form, and is determined by the coincidence of status, duty and authority"— with the duty to ensure that taxes are paid flowing from authority that enables one to do so. *Cook*, 52 Fed.Cl. at 68; *see also Purcell v. United States*, 1 F.3d 932, 937 (9th Cir. 1993); *George v. United States*, 819 F.2d 1008, 1011 (11th Cir.1987); *Michaud v. United States*, 40 Fed.Cl. 1, 16 (1997); *Ghandour v. United States*, 36 Fed.Cl. 53, 60 (1996), *aff'd*, 132 F.3d 52 (1997) (table). While determining responsibility perforce requires consideration of the totality of the circumstances, the Federal Circuit has outlined a number of relevant considerations:

> [A] person's "duty" under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form. Thus, where a person has authority to sign the checks of the corporation or to prevent their issuance by denying a necessary signature or where the person controls the disbursement of the payroll or controls the voting stock of the corporation he will generally be held "responsible."

*Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed.Cir.1984) (internal citations omitted); *De Alto v. United States*, 40 Fed.Cl. 868, 876 (1998).[11] The inquiry thus looks through the—

*Slodov*, 436 U.S. at 250, 98 S.Ct. 1778. The most severe of these prongs imposed a criminal sanction, equal to 100 percent of the evaded or unpaid tax, on any person who "willfully refuses to pay, collect, or truly account for and pay over" certain specified excise taxes. This criminal provision later evolved first to cover Social Security taxes, *see* Social Security Act of Aug. 14, 1935, Pub.L. No. 74–271, ch. 531, § 807(c), 49 Stat. 620, 638, and, ultimately, to reach the failure to pay over the withholding portion of income taxes, *see* Current Tax Payment Act of 1943, Pub.L. No. 68, ch. 120, 57 Stat. 126, 138. In enacting the 1954 Code, Congress severed this provision from the other criminal penalties, because it did not provide for imprisonment, and instead grouped it with other assessable noncriminal penalties, renumbering it as section 6672 of the Code. Although both the House and Senate reports commented on this shift, neither otherwise described the purpose of what effectively became a civil penalty. *See* S.Rep. No., 1622, 83d Cong.,

2d Sess. 5245 (1954); H.R.Rep. No. 1377, 83d Cong., 2d Sess. 4568 (1954); *see also* James E. Hungerford, Note, "Howard v. United States: Who Should be Responsible for the 100 Percent Penalty?," 12 U. Puget Sound L.Rev. 451, 454–56 (1989) (discussing this history).

11. Other courts employ as many as seven factors, *to wit:* (i) is an officer or member of the board of directors, (ii) owns shares or possesses an entrepreneurial stake in the company, (iii) is active in the management of day-to-day affairs of the company, (iv) has the ability to hire and fire employees, (v) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (vi) exercises control over daily bank accounts and disbursement records, and (vii) has check-signing authority. *See, e.g., Vinick*, 205 F.3d at 7; *United States v. Rem*, 38 F.3d 634, 642 (2d Cir.1994); *United States v. Carrigan*, 31 F.3d 130, 133 (3d Cir.1994); *Barnett v. Internal Rev. Serv.*, 988 F.2d 1449, 1455 (5th Cir.1993), *cert.*

mechanical functions of the various corporate officers, to determine the persons having 'the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations.' The inquiry required by the statute is a search for a person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes.

*Godfrey*, 748 F.2d at 1575 (internal citations omitted); *De Alto*, 40 Fed.Cl. at 875; *see also Barrett*, 217 Ct.Cl. 617, 580 F.2d 449, 452 (1978); *Bolding v. United States*, 215 Ct.Cl. 148, 565 F.2d 663 (1977); *Bauer*, 543 F.2d at 148; *White*, 372 F.2d at 517 ("the courts are looking for the person who could have seen to it that the taxes were paid").

■ Notwithstanding the "ultimate authority" language employed in *Godfrey*, the Federal Circuit and other courts have made clear that there can be more than one responsible person as "liability attaches to all those under the duty set forth in the statute." *Harrington v. United States*, 504 F.2d 1306, 1311 (1st Cir.1974); *see also, e.g., Lubetzky v. United States*, 393 F.3d 76, 80 (1st Cir.2004); *Gephart*, 818 F.2d at 473; *Godfrey*, 748 F.2d at 1574–75; *Thibodeau v. United States*, 828 F.2d 1499, 1503 (11th Cir.1987); *White*, 372 F.2d at 516; *Scott*, 354 F.2d at 296. "[T]he statute expressly applies to 'any' responsible persons," one court has explained, "not just to the person *most* responsible for the payment of the taxes," noting further that "[t]here may be—indeed, there usually are—multiple responsible persons in any company." *Barnett*, 988 F.2d at 1455 (emphasis in original); *see also Gephart*, 818 F.2d at 476 ("[w]hile it may be that [other corporate officials] were *more* responsible than plaintiff, and exercised *greater* authority, this does not affect a finding of

liability against the plaintiff" (emphasis in original)); *Godfrey*, 748 F.2d at 1575; *Bolding*, 565 F.2d at 663; *White*, 372 F.2d at 516; *Ghandour*, 36 Fed.Cl. at 61. Accordingly, that Mr. Robbins has admitted to being responsible for Star Foods' failure to pay over taxes does not, in and of itself, preclude a finding that Mr. Salzillo is likewise responsible.

In the case *sub judice*, many of the factors relied upon by courts in finding responsibility are conspicuously absent: plaintiff did not control the company's voting stock (indeed, he was not a shareholder); he could not prevent the issuance of checks, including payroll checks, by withholding his signature; and, by all believable accounts, did not have the power to hire or fire employees.[12] Yet, at least in title, Mr. Salzillo was a high-ranking financial officer of the company and he had signature authority over all the relevant Star Foods bank accounts. And, with the exception of payroll checks, most of the Star Foods checks during the period at issue were signed by plaintiff. Moreover, even when eventually deprived of Mr. Robbins' signature stamp, plaintiff still theoretically could have written checks to the IRS using his own signature authority. But, could he, by writing and mailing such a check, actually have transferred funds to the IRS in payment of the delinquent payroll taxes?

■ As a threshold matter, plaintiff contends that the specific instructions not to pay the IRS that he received from Mr. Robbins, *a fortiori*, made the latter solely responsible for nonpayment of the withholding taxes. The decisional law is decidedly to the contrary, with a phalanx of opinions holding that "[i]nstructions from a superior not to pay taxes do not, however, take a person otherwise responsible under section 6672(a) out of that category." *Brounstein*, 979 F.2d at 955; *see also Lubetzky*, 393 F.3d at 81–82 (sum-

---

*denied*, 510 U.S. 990, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993); *Denbo v. United States*, 988 F.2d 1029, 1032 (10th Cir.1993); *Brounstein v. United States*, 979 F.2d 952, 954–55 (3d Cir.1992); *Gephart v. United States*, 818 F.2d 469, 473 (6th Cir.1987).

12. While defendant claims that Mr. Salzillo hired two employees in the accounting and payroll

office, Mr. Salzillo convincingly testified that he did so only with the specific approval of Mr. Robbins. Consistent with that testimony, Mr. Robbins indicated, in his interview with the IRS, that only he and the operational managers (*e.g.*, his brother, Joel) had the power to hire and fire employees.

marizing cases); *Greenberg v. United States,* 46 F.3d 239, 244 (3rd Cir.1994) (fact that employee was instructed to pay creditors other than the United States did not "negate his status as a responsible person"); *Gephart,* 818 F.2d at 474 (general manager of company held "responsible" despite instructions from officer-directors not to pay the IRS); *Roth v. United States,* 779 F.2d 1567, 1571 (11th Cir.1986) ("In our view, no instruction by the president or the majority owner of [the corporation] could effectively bar an otherwise responsible officer from paying these funds in accordance with law."); *Howard v. United States,* 711 F.2d 729, 734 (5th Cir.1983) (individual was "responsible person" despite the fact that "he was merely following ... orders in refusing to pay the taxes owed"); *see generally,* Corrie Lynn Lyle, "The Wrath of I.R.C. § 6672: The Renewed Call for Change—Is Anyone Listening? If You Are a Corporate Official, You Had Better Be," 74 S. Cal. L.Rev. 1133, 1141 (2001). This rule, moreover, has been applied even where it was found likely that had the employee disobeyed the instruction not to pay the IRS, he or she would have been fired. *See, e.g. Lubetzky,* 393 F.3d at 81–82; *Greenberg,* 46 F.3d at 244 ("[i]t is also not a defense that a taxpayer would lose his job if he signed a check to the IRS without the express authority of a superior"); *Howard,* 711 F.2d at 734 ("The fact that Jennings might well have fired Howard had he disobeyed Jennings' instructions and paid the taxes does not make Howard any less responsible for their payment.").

■ But was Mr. Salzillo—to use the words of *Brounstein*—"otherwise responsible"? The record reveals that Mr. Robbins so thoroughly controlled the extraordinarily limited finances of the company as to make it virtually impossible for Mr. Salzillo to send funds to the IRS without his actions being immediately detected and actual payment averted. Thus, the record reveals that, long before Mr. Salzillo became the so-called "chief financial officer," Mr. Robbins was constantly apprised of the company's precarious cash position, and that, as day-to-day needs arose, he allocated the scarcely available funds to maintain and maximize production. As prime indication of the depth and effectiveness of his controls, the record reveals—and IRS records confirm—that when Mr. Salzillo attempted to pay the IRS $50,000 without obtaining Mr. Robbins' permission, the latter quickly detected the unauthorized use of funds and shifted money from the account in question to prevent the check drafted by Mr. Salzillo from being cashed by the IRS. Given the pervasive nature of Mr. Robbins' control, plaintiff had no reason to believe that subsequent attempts to pay the IRS would prove anything more than a hollow gesture.[13] Moreover, while defendant claims otherwise, Mr. Salzillo understandably did not contact the board for assistance because he was under the impression that Mr. Robbins had kept the board apprised and was acting with its full approval.[14] Accordingly, this is not a case in which a superior simply ordered an employee not to pay the IRS. Rather, here, Mr. Robbins took steps not only to designate the creditors that would be paid, but also to ensure that others, including the IRS, would not be paid, thereby circumscribing Mr. Salzillo's ability to transfer corporate funds to the IRS in payment of Star Foods' delinquent payroll taxes.

In like circumstances, a second line of cases has absolved individuals from liability where, apart from any instructions, they were in no real position to ensure that funds

---

13. Defendant suggests that apart from the accounts controlled by Mr. Robbins, Mr. Salzillo could have contacted Mr. Hastings and directed him to issue Symrel checks to pay the IRS. The record, however, reveals that the first time that Mr. Salzillo contacted Mr. Hastings to obtain cash for payroll, Mr. Hastings contacted Mr. Robbins to determine whether the transaction was approved because it was not typical. Mr. Hastings undoubtedly would have done the same thing had Mr. Salzillo instructed him to send Symrel checks to the IRS.

14. In its post-trial reply brief, defendant asserts—for the first time in this litigation—that the financial reports and statements made by Mr. Salzillo to the board were inaccurate because they did not reflect the company's tax liabilities. However, the pages of the transcript that defendant cites for this proposition do not remotely support its claim. And the record does not include any of the referenced reports or statements.

would actually pass from the business to the IRS. These cases, many of which are in this court, stress that while an individual's title or authority to sign checks may suggest a theoretical authority to effectuate such a payment, those features are not controlling if, based on the record as a whole, it preponderates that a given individual actually lacked the effective ability to pay taxes over to the IRS. *See, e.g., United States v. Rem,* 38 F.3d 634, 647(2d Cir.1994) (the power to sign checks and the holding of corporate office "can exist in circumstances where the individual in reality does not possess significant control over corporate finances"); *Barrett,* 580 F.2d at 453 (despite having authority to sign checks, corporate director not "responsible officer" where corporate president controlled which creditors would be paid, including the IRS); *Bauer,* 543 F.2d at 149 ("Mere office holding of and by itself does not render one responsible for the collection and paying over of employee withholding taxes."); *DeAlto,* 40 Fed.Cl. at 878 ("While the existence of another responsible person would not excuse plaintiff, [plaintiff's superior] retained such exclusive authority that plaintiff effectively had none when dealing with creditors"); *Williams v. United States,* 25 Cl.Ct. 682, 684 (1992) (officer that had written checks to creditors other than the IRS held not responsible where "though plaintiff had check writing authority and seemingly important titles, he lacked any independent authority within [the company]."); *Heimark v. United States,* 18 Cl.Ct. 15, 21–23(1989) (treasurer not responsible person where responsibilities were ministerial and president of company was "autocratic" in the control of funds).[15] As summarized by a leading commentator, these cases hold that "the concept of responsibility connotes more than corporate title" or a "theoretical authority" to pay over taxes, but rather "arises out of control actually exercised over the financial operations of the business." Michael I. Saltzman, IRS Practice and Procedure ¶ 17.07 (2005).

In many ways, these case view the multi-factored tests commonly employed in assessing responsibility from a practical perspective: after all, liability under section 6672 is not imposed *because* someone is an officer or shareholder, or has check writing authority, or even effectuates payments to third parties rather than the IRS. Rather, the existence *vel non* of these features is important only in indicating whether such an individual had the effective power to make (or cause others to make) payments to the IRS. By carefully linking these factors together, the existence of the requisite authority or power may be implied. But, it is one thing to make this junction where there is little or no countervailing evidence, and quite another to do so where, as here, there is direct and compelling evidence that the subject individual, in reality, lacked the ability to effectuate a tax payment. This point bears emphasis, as it is only from having the ability to effectuate a tax payment that the duty to make such payments springs and only from the breach of that duty that liability under section 6672 attaches. While, in each of the above cases, the means for controlling whether the IRS would be paid differed, the root principle that emerges is that an individual is not responsible if a third party exercises so much control over the corporate fisc as affirmatively to prevent that individual from effectuating payments to the IRS.[16] That is exactly what happened here, with Mr. Robbins playing the ascendant role and thereby depriving Mr. Salzillo of the effective power to pay the IRS. The consequent finding that Mr. Salzillo was not responsible is consistent not only with the second line of authority outlined above, but also with the Federal Circuit's instructions in *Godfrey,* 748 F.2d at 1575, that courts examining authority should give effect to "substance, not form," and not be inordinately swayed by titular designations or who

**15.** *See also, e.g., Carrigan,* 31 F.3d at 134 (concluding that employee with check-signing authority may not have been a "responsible person" insofar as his control over the affairs of the company was "significantly circumscribed" by others); *Barton v. United States,* 988 F.2d 58 (8th Cir.1993).

**16.** Notably, this not the first case in which an individual's inability to effectuate a tax payment was demonstrated by a failed attempt to transfer funds to the IRS. *See Geiger v. United States,* 583 F.Supp. 1166 (D.Ariz.1984) (plaintiff not responsible where tried to pay taxes, but president withdrew the money in the account).

performed "mechanical duties," such as signing checks.[17]

To be sure, Mr. Salzillo simply could have quit. But, as was true in *Slodov*, such action "would more likely [have] frustrate[d] than aid[ed] the IRS's collection efforts." 436 U.S. at 251, 98 S.Ct. 1778. In *Slodov*, the Court held that section 6672 should not be construed so as to impose liability upon new management for previously outstanding taxes, because such new management provided hope that prior delinquencies would be addressed as funds became available. *Id.* at 252–54, 98 S.Ct. 1778. Likewise, Mr. Salzillo's continued employment provided the IRS with its best, and perhaps only, hope that the arrearage would be paid. Had he departed, the IRS would have lost the assistance of the person within the corporate structure apparently most committed to seeing overdue— and current—payroll taxes paid. Indeed, given the countervailing incentives that Mr. Robbins possessed,[18] one can readily surmise that Mr. Salzillo's departure would, from the IRS' standpoint, have made matters worse. At all events, while Mr. Salzillo would not have been responsible had he quit, he did not become responsible by failing to do so—his status remained that of individual unable to effectuate the payment of taxes to the IRS without Mr. Robbins' permission. As such, in reality, he was not a "responsible person" and thus is not liable for the penalty assessed under section 6672 of the Code.

### III. CONCLUSION

To say more here, would be to paint the lily. This court finds that plaintiff, Jose Salzillo, was not a "responsible person" under section 6672 of the Code. Accordingly, the Clerk is directed to enter judgment for plaintiff in the amount of $12,667.00, plus interest in accordance with law. The Clerk shall also dismiss defendant's counterclaim.

**IT IS SO ORDERED.**

---

17. The Court of Claims likewise wrote in *White:* "In reaching a determination with respect to the person or persons upon whom to impose responsibility and liability for the failure to pay taxes, the courts tend to disregard the mechanical functions of the various corporate officers and instead emphasize where the ultimate authority for the decision not to pay the taxes lies." *White,* 372 F.2d at 516; *see also Vinick,* 205 F.3d at 8 ("the goal of § 6672 is to fix liability on those persons who could have and should have remitted taxes to the IRS"); *Raba v. United States,* 977 F.2d 941, 943 (5th Cir.1992) ("The crucial examination is whether a person had the 'effective power to pay taxes.'"); *Howard,* 711 F.2d at 734 ("Authority to pay in this context means *effective power* to pay." (emphasis in original)); *Cabot v. United States,* 38 Fed.Cl. 682, 694 (1997) ("[t]he court must look beyond organizational form").

18. Mr. Robbins had a score of reasons for keeping the business alive at the expense of the IRS: not only had he invested millions of dollars in the company, but he stood to obtain a controlling interest if the company emerged from bankruptcy. According to his testimony, Mr. Robbins and the other investors would have realized approximately $3.5 million more if they sold Star Foods as a going concern, rather than as a collection of assets. Finally, as noted, several of Mr. Robbins relatives worked for the company. Thus, while Mr. Robbins would have the court believe that Mr. Salzillo knowingly risked a huge personal tax liability in exchange for a $16,000 annual raise (some of which he was later forced to forego), it is far more believable, based on the record as a whole, that Mr. Robbins, in an effort to protect his investment and maximize his return, took extreme steps to ensure that only the creditors that furthered his interests were paid.